# EXHIBIT 2

185 FERC ¶ 61,191
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Willie L. Phillips, Acting Chairman;
Allison Clements, and Mark C. Christie.

| | |
|---|---|
| ANR Pipeline Company | Docket No.  CP23-15-000 |

ORDER ISSUING CERTIFICATE AND APPROVING ABANDONMENT

(Issued December 19, 2023)

1.     On November 14, 2022, ANR Pipeline Company (ANR) filed an application in Docket No. CP23-15-000, under sections 7(b) and (c) of the Natural Gas Act (NGA)[1] and Part 157 of the Commission's regulations[2] for authorization to construct and operate its Wisconsin Reliability Project.  The project is designed to upgrade existing pipeline and compression facilities with new, more modern pipeline and compression facilities and provide 132,000 dekatherms per day (Dth/d) of incremental transportation service on ANR's pipeline system.  For the reasons discussed below, we grant the requested authorizations, subject to the conditions described herein.

## I.     **Background and Proposal**

2.     ANR, a Delaware limited partnership,[3] is a natural gas company, as defined by section 2(6) of the NGA,[4] engaged in the transportation of natural gas and operation of underground storage fields in interstate commerce subject to the jurisdiction of the Commission.  ANR's system extends through Arkansas, Delaware, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Michigan, Mississippi, Missouri, Nebraska, Ohio, Oklahoma, South Dakota, Tennessee, Texas, and Wisconsin.

3.     The proposed Wisconsin Reliability Project consists of:  (i) replacement of approximately 48 miles of existing pipeline, originally installed in 1949, 1950, and 1960, with approximately 51 miles of new, larger-diameter pipeline, located mostly within ANR's existing right-of-way; (ii) modification and replacement of compression facilities

---

[1] 15 U.S.C. § 717f(b), (c).

[2] 18 C.F.R. pt. 157 (2022).

[3] ANR is a wholly owned indirect subsidiary of TC Energy Corporation.

[4] 15 U.S.C. § 717a(6).

originally installed between 1958 and 1973 at two existing compressor stations; (iii) modifications to six meter stations; and (iv) installation and removal of auxiliary facilities.[5]

4.      Specifically, ANR proposes to:

- install two new 3,750 ISO-rated horsepower (ISO hp) Dual Drive Technologies, Ltd.™ (dual-drive)[6] compressor units, remove five existing natural gas compressor units, totaling 3,900 ISO hp, and uprate one existing natural gas compressor unit from 4,000 ISO hp to 4,700 ISO hp at the existing Kewaskum Compressor Station in Sheboygan County, Wisconsin, resulting in a net increase from 7,900 to 12,200 in certificated ISO hp;

- install two new 3,750 ISO hp dual-drive compressor units, remove one existing 1,100 ISO hp turbine natural gas compressor unit, install an electric substation, and upsize the station inlet and discharge piping at the existing Weyauwega Compressor Station in Waupaca County, Wisconsin, resulting in a net increase from 8,600 to 15,000 in certificated ISO hp;

- replace approximately 24 miles of existing 14-inch-diameter and 22-inch-diameter pipeline on ANR's ML-301 system (ML-301) with 30-inch-diameter and 36-inch-diameter pipeline in Washington and Waukesha Counties, Wisconsin, and McHenry County, Illinois, and replace approximately 24 miles of existing 24-inch-diameter pipeline on ANR's ML-226 system (ML-226) with 30-inch-diameter pipeline in Waupaca, Outagamie, and Winnebago Counties, Wisconsin;

- modify the existing Lena, Merrill, Oshkosh, South Wausau, Stevens Point, and Two Rivers Meter Stations to accommodate deliveries of incremental volumes in Oconto, Lincoln, Winnebago, Marathon, Portage, and Manitowoc Counties, Wisconsin; and

- install or modify other minor appurtenant facilities.

---

[5] Application at 1.

[6] Dual Drive Technologies, Ltd.™ units are redundant prime mover systems composed of a combination electric motor connected to an engine for powering a gas compressor.  These units can switch between electricity and natural gas in the event of an abnormal operating condition (e.g., power outage) to provide enhanced system reliability and maintain customer commitments.

5.      ANR estimates the total cost of the project to be approximately $757.6 million. ANR proposes to allocate approximately $584.6 million, or 77% of the total cost of the project, based on a like-for-like equivalency cost allocation methodology, to the replacement component of the project as supporting improvements to existing services, while the remaining $173 million, or 23% of total costs, would be allocated to the expansion component and recovered from shippers using the new capacity created by the project through existing system recourse rates under Rate Schedules FTS-3 or ETS.[7]

6.      ANR states that the replacement of existing pipeline and compression facilities will increase the reliability, safety, and long-term integrity of its existing system.[8] Additionally, ANR asserts that the project will make available 132,000 Dth/d of incremental mainline transportation service and, when combined with existing reserved capacity capable of providing 12,000 Dth/d of transportation service, will provide a total of 144,000 Dth/d[9] of incremental transportation service for natural gas supply to residential, commercial, and industrial consumers.[10]

7.      ANR held an open season and request for turnback capacity from December 15, 2021, through January 18, 2022.  As a result of the open season, ANR executed binding precedent agreements with North Shore Gas Company, Wisconsin Electric Power Company, Wisconsin Public Service Corporation, and Wisconsin Power and Light Company (shippers) for the entire 144,000 Dth/d of transportation service created by the project and previously reserved capacity, commencing November 1, 2025, for ten-year term commitments.  ANR states that other than the shippers, no other party submitted a bid during the open season period.  The shippers are all unaffiliated local distribution companies or utility providers in Wisconsin and Illinois.  ANR did not receive any offers for turnback capacity.

---

[7] Application Ex. K.

[8] Application at 1-2.

[9] Pursuant to Section 6.3.3 of the General Terms and Conditions of its tariff, ANR has reserved certain capacity on its system for the project, thus reducing the facilities that would need to be constructed and installed to implement the expansion portion of the project, while still meeting the market need of the shippers.  The reserved capacity consists of unsubscribed and/or capacity under expiring or terminating service agreement not subject to the right of first refusal, pursuant to ANR's tariff.  Application at 20.

[10] *Id.* at 2.

## II.    Notice, Interventions, and Comments

8.      Notice of ANR's application was published in the *Federal Register* on December 2, 2022,[11] with comments, interventions, and protests due December 19, 2022. Thirteen entities filed timely, unopposed motions to intervene.[12]  On December 20, 2022, DTE Gas Company filed an opposed motion to intervene out of time, which was granted.[13]

9.      Wisconsin State Representative David Murphy, the Wisconsin Pipeline Construction Trades Unions, North Shore Gas Company, Wisconsin Electric Power Company, and the Wisconsin Public Service Corporation filed comments in support of the project, asserting that it will provide economic benefits, is supported by precedent agreements, and will provide reliable, efficient natural gas service to the area.

10.      Sherman Heights, LP, America Farms, Inc., Alice Lenser, Andy Ujazdowski, Shelli Brazgel, and Wisconsin Senator Dan Knodl filed comments expressing concerns regarding project impacts to private lands, including agricultural lands.  These comments are addressed in the environmental assessment (EA) prepared by Commission staff regarding the project, and, as appropriate, discussed below.

11.      On December 19, 2022, Antero Resources Corporation and MU Marketing, LLC (collectively, Antero Parties) filed comments questioning the need and the allocation of costs for the replacement facilities.  Antero Parties allege that ANR does not sufficiently demonstrate a need to replace the existing facilities, and they argue that if ANR cannot articulate a specific reason why the replacement is necessary, then the replacement costs should instead be allocated to the expansion shippers.[14]  On March 27, 2023, Antero Parties filed additional comments stating that the proposed replacement facilities are substantially larger than the facilities being replaced, and therefore the Commission

---

[11] 87 Fed. Reg. 74,138 (Dec. 2, 2022).

[12] Timely motions to intervene were filed by:  WEC Companies; Nicor Gas Company; Wisconsin Power and Light Company; Northern States Power Company—Minnesota and Northern States Power Company—Wisconsin, jointly; Atmos Energy Corporation; NJR Energy Services Company; America Farms Inc.; Alice A. Lenser; Andy Ujazdowski; Sherman Heights, LP; and, Antero Resources Corporation and MU Marketing, LLC, jointly.  All timely, unopposed motions to intervene are granted by operation of Rule 214 of the Commission's Rules of Practice and Procedure.  18 C.F.R. § 385.214(c) (2022).

[13] March 29, 2023 Notice Granting Late Intervention.

[14] Antero Parties Dec. 18, 2022 Comments at 3-4.

should ensure that ANR's proposed replacement facilities are only necessary to achieve the stated project capacity.[15]  Antero Parties assert that ANR's request to increase the size of the replaced facilities indicates that the Wisconsin Reliability Project is "essentially a pre-build for future expansion," and that under the current proposal existing shippers would essentially be required to pay for future expansion.[16]  On June 7, 2023, Antero Parties filed additional comments reiterating the concerns raised in their prior comments regarding cost allocation and whether existing shippers would be required to pay for unnecessarily large, and therefore more expensive, replacement facilities.[17]  On January 3, 2023, and April 6, 2023, ANR filed comments in response to Antero Parties' comments, stating that the project is needed and that the proposed cost allocation is appropriate.[18]  Antero Parties' and ANR's comments are addressed below.

## III.  <u>Discussion</u>

12.    Since the proposed facilities for the Wisconsin Reliability Project will be used to transport natural gas in interstate commerce, subject to the jurisdiction of the Commission, the construction and operation of the facilities and capacity are subject to the requirements of subsections (c) and (e) of section 7 of the NGA.[19]  In addition, ANR's proposed abandonment of pipeline and certain natural gas compression facilities is subject to the requirements of section 7(b) of the NGA.[20]

### A.    <u>Abandonment</u>

13.    Section 7(b) of the NGA provides that an interstate pipeline company may abandon jurisdictional facilities or services only if the Commission finds the abandonment is permitted by the present or future public convenience and necessity.[21]  In deciding whether a proposed abandonment is warranted, the Commission considers all relevant factors, but the criteria vary with the circumstances of the particular proposal.[22]

---

[15] Antero Parties March 27, 2023 Supplemental Comments at 1-3.

[16] *Id.* at 3-4.

[17] Antero Parties June 7, 2023 Supplemental Comments at 2.

[18] ANR January 3, 2023 Comments and ANR April 6, 2023 Comments.

[19] 15 U.S.C. § 717f(c), (e).

[20] *Id.* § 717f(b).

[21] *Id.*

[22] *El Paso Nat. Gas Co.*, 148 FERC ¶ 61,226, at P 11 (2014) (*El Paso*).

Document Accession #: 20231219-3072   Filed Date: 12/19/2023

Continuity and stability of existing services are the primary considerations in assessing whether the public convenience or necessity allow the abandonment.[23]  If the Commission finds that an applicant's proposed abandonment for particular facilities will not jeopardize continuity of existing gas transportation services, the Commission generally will find that the public convenience or necessity permits the abandonment.[24]

14.     Here, ANR proposes to abandon and replace aging pipeline infrastructure and six compressor units with new, more reliable and efficient infrastructure and hybrid compression.  As is discussed below, we find that ANR has justified its determination that that there is a need to replace the aging facilities.  The proposed replacement will maintain existing service and provide the new incremental service.  Accordingly, we find ANR's proposed abandonment of the aging pipeline infrastructure and gas-driven compression is permitted by the public convenience or necessity.

## B.  Certificate Policy Statement

15.     The Certificate Policy Statement provides guidance for evaluating proposals to certificate new construction.[25]  The Certificate Policy Statement establishes criteria for determining whether there is a need for a proposed project and whether the proposed project will serve the public interest.  It explains that, in deciding whether to authorize the construction of major new natural gas facilities, the Commission balances the public benefits against the potential adverse consequences.  The Commission's goal is to appropriately consider the enhancement of competitive transportation alternatives, the possibility of overbuilding, subsidization by existing customers, the applicant's responsibility for unsubscribed capacity, the avoidance of unnecessary disruptions of the

---

[23] *Nat'l Fuel Gas Supply Corp.*, 160 FERC ¶ 61,050, at P 17 (2017) (citing *El Paso*, 148 FERC ¶ 61,226 at P 12).

[24] *See, e.g.*, *Tex. E. Transmission, LP*, 176 FERC ¶ 61,206, at P 11 (2021) (citing *Trunkline Gas Co.*, 145 FERC ¶ 61,108, at P 65 (2013)).

[25] *Certification of New Interstate Nat. Gas Pipeline Facilities*, 88 FERC ¶ 61,227, *corrected*, 89 FERC ¶ 61,040 (1999), *clarified*, 90 FERC ¶ 61,128, *further clarified*, 92 FERC ¶ 61,094 (2000) (Certificate Policy Statement).  On March 24, 2022, the Commission issued an order converting the policy statements issued in February 2022 to draft policy statements.  *Certification of New Interstate Nat. Gas Facilities Consideration of Greenhouse Gas Emissions in Nat. Gas Infrastructure Project Reviews*, 178 FERC ¶ 61,197 (2022) (Order on Draft Policy Statements).

Document Accession #: 20231219-3072    Filed Date: 12/19/2023

environment, and the unneeded exercise of eminent domain in evaluating new pipeline construction.

16.    Under this policy, the threshold requirement for applicants proposing new projects is that the applicant must be prepared to financially support the project without relying on subsidization from its existing customers.  The next step is to determine whether the applicant has made efforts to eliminate or minimize any adverse effects the project might have on the applicant's existing customers, existing pipelines in the market and their captive customers, and landowners and communities affected by the route of the new pipeline facilities.  If residual adverse effects on these interest groups are identified after efforts have been made to minimize them, the Commission will evaluate the project by balancing the evidence of public benefits to be achieved against the residual adverse effects.  This is essentially an economic test.  Only when the benefits outweigh the adverse effects on economic interests will the Commission proceed to complete the environmental analysis where other interests are considered.

### 1.    No Subsidy Requirement

17.    As discussed above, the threshold requirement for pipelines proposing new projects is that the applicant must be prepared to financially support the project without relying on subsidization from its existing customers.  The Commission has determined that generally where a pipeline proposes to charge incremental rates for new construction that are higher than the pipeline's existing system rates, the pipeline satisfies the threshold requirement that the project will not be subsidized by existing shippers.[26]  As discussed below, ANR proposes to apply the maximum base-system (i.e., the generally applicable) recourse rates under Rate Schedules FTS-3 and ETS from Zone 7 to Zone 7, as initial recourse rates for incremental expansion service on the project.  However, as discussed below in the rate section,[27] illustrative incremental rates designed to recover the full cost of the expansion component of the project are higher than the existing applicable system rates.  Therefore, we are rejecting ANR's proposal to charge existing system rates for the proposed expansion service and requiring it to establish incremental rates for the service.  With that change, we find that ANR's existing shippers will not subsidize the expansion component project.

18.    The Certificate Policy Statement recognizes the appropriateness of rolled-in rate treatment for projects constructed to improve the reliability of service to existing

---

[26] *See, e.g.*, *Transcon. Gas Pipe Line Corp.*, 98 FERC ¶ 61,115, at 61,552 (2002).

[27] *See infra* PP 32-34.

Document Accession #: 20231219-3072     Filed Date: 12/19/2023

customers or to improve service by replacing existing capacity.[28]  As discussed below, ANR proposes to roll into its system rates the costs of the replacement component of the project, which involves replacing segments of existing pipeline and aging compressor units at the Kewaskum and Weyauwega Compressor Stations with new, more efficient and reliable infrastructure.  For these reasons, we find that ANR's existing shippers will not subsidize the Wisconsin Reliability Project.

## 2.  __Project Need__

19.     Additionally, we find that ANR has demonstrated a need for the Wisconsin Reliability Project.  The project expansion facilities are designed to provide an additional 132,000 Dth/d of firm transportation service to meet growing demand for residential, commercial, and industrial customers in the states of Wisconsin and Illinois, while increasing the base system reliability, safety, and long-term integrity of ANR's system.  ANR entered into binding precedent agreements with the shippers for 100% of the project's expansion capacity.  We find this is significant evidence of the need for the proposed expansion project.[29]

Antero Parties' Comments and ANR's Responsive Comments

20.     Antero Parties question whether there is a need to replace the existing facilities, alleging that ANR has not demonstrated why the replacement is needed beyond making vague statements that the replacement will allow it to continue to provide safe and reliable service.[30]  Antero Parties argue that, if ANR cannot articulate a specific reason why the replacement is necessary, existing system shippers should not be allocated the costs associated with the replacement, and the replacement costs should instead be allocated to the expansion shippers.[31]  Further, Antero Parties contend that the

---

[28] *See Gas Transmission Nw., LLC*, 180 FERC ¶ 61,056, at P 30 (2022) (citing Certificate Policy Statement, 88 FERC at 61,746 n.12).

[29] *See, e.g.*, *Tex. Gas Transmission, LLC*, 181 FERC ¶ 61,049 (2022) (finding a long-term precedent agreement for almost 100% of the project's capacity is significant evidence of need for the proposed project); *Enable Gas Transmission, LLC*, 175 FERC ¶ 61,183, at P 30 (2021) (finding a long-term precedent agreement for approximately 67% of the project's capacity demonstrated a need for the proposed project); *Double E Pipeline, LLC*, 173 FERC ¶ 61,074, at P 35 (2020) (finding the 10-year, firm precedent agreements for approximately 74% of the project's capacity adequately demonstrated that the project was needed).

[30] Antero Parties Dec. 19, 2022 Comments at 3-4.

[31] *Id.*

Document Accession #: 20231219-3072     Filed Date: 12/19/2023

Commission has only approved proposals to simultaneously replace and expand facilities when an applicant has demonstrated that replacement of a particular asset is necessary to maintain system reliability or to comply with a government mandate.[32]

21.     ANR filed reply comments asserting that the proposal is appropriate and meets the replacement standards developed by the Commission by providing system integrity and reliability, along with responding to growing demand.[33]  ANR further states that the pipeline segments that it proposes to replace were installed between 1949 and 1960, and that it is appropriate to replace the aging facilities, in conjunction with the expansion project to serve new demand, to ensure that it can continue to provide safe and reliable service to customers.[34]  Specifically, ANR explains that a now-outdated welding process was used to manufacture the pipe that it proposes to replace; the welding process created manufacturing flaws and steel hard spot flaws and was used on approximately 94% of the pipe proposed to be replaced or abandoned.[35]  Additionally, integrity inspections of the facilities conducted by ANR identified several anomalies that pose a potential risk or make the facilities prone to failure.[36]  ANR provided records of numerous outages experienced on the facilities that may be related to their vintage or the construction methods used in their installation.[37]

22.     ANR further states that existing customers will benefit from the increased operational flexibility through the addition of system line pack.[38]  ANR contends that these changes will contribute to needed gas inventory that is required during normal and peak day operations, when gas demand is greatest and the need to avoid service interruptions is highest.[39]  Additionally, ANR argues that the replacement of dated

---

[32] *Id.* at 3.

[33] ANR Jan. 3, 2023 Comments at 5-6.

[34] *Id.*

[35] ANR September 22, 2023 Data Response at 4.

[36] *Id.* at 2-3.  Identified anomalies include corrosion, axial cracks, wrinkle bends, and manufacturing anomalies.

[37] *Id.* at 8-10.

[38] ANR Jan. 3, 2023 Comments at 5-6.

[39] *Id.*

compressor units with updated technology will improve long-term reliability for existing customers, particularly at times when gas demand is highest.[40]

23.    Antero Parties also question why the proposed replacement facilities are larger in size than the facilities to be replaced, and request that the Commission ensure that ANR is only proposing to construct facilities that are necessary to achieve its stated project capacity.[41]  Antero Parties express concern that ANR intends to use the project as a pre-build for a future expansion at the expense of system shippers, and, if that were the case, existing shippers would essentially be required to pay for future expansion.[42]

24.    In response to Antero Parties' concerns about project capacity, ANR reiterates that the project is appropriate and consistent with Commission policy and precedent.[43]  It asserts that Antero Parties' assertions that the proposal is a pre-build for future expansion are unsupported.[44]  ANR states that the project design was influenced by existing contractual pressure commitments to maintain minimum pressures at most of ANR's delivery points in Wisconsin.[45]  To provide additional justification for the project design, ANR maintains that the size of the proposed facilities is affected by its obligation to provide non-ratable takes[46] for the project shippers.[47]  Due to the commitment to provide non-ratable takes to the project shippers, ANR states that it could be obligated to provide up to the equivalent of 183,400 Dth/d of service at any given hour, and therefore

---

[40] *Id.*

[41] Antero Parties March 27, 2023 Supplemental Comments at 1-2; Antero Parties June 7, 2023 Supplemental Comments at 2.

[42] Antero Parties March 27, 2023 Supplemental Comments at 1-2.

[43] ANR April 6, 2023 Comments at 3-4.

[44] *Id.*

[45] ANR April 3, 2023 Answer at 4-5.

[46] ANR states that pursuant to its rate schedules, project shippers subscribe for service on an hourly basis, rather than a daily basis.  This allows shippers to fluctuate hourly flows, provided the shipper does not exceed its maximum daily contract quantity. *See id.* at 4.

[47] *Id.* at 4.

Document Accession #: 20231219-3072          Filed Date: 12/19/2023

designed the proposed facilities to support the daily incremental entitlements and the hourly incremental entitlements.[48]

25.     On July 12, 2023, Commission staff issued a data request asking ANR to provide the transient hydraulic models to supplement flow diagrams filed in its Exhibit G, which represents ANR's system before and after the project.  On July 14, 2023, ANR filed the requested flow diagrams and corresponding hydraulic models.

Commission Determination

26.     We find that ANR has demonstrated that there is a need to replace the proposed pipeline and compression facilities.  As explained above, the pipeline and compression facilities proposed for replacement were constructed between the 1940s and 1960s using construction techniques that have since been shown to result in hard spots that can lead to outages on the system.[49]  ANR has provided persuasive evidence that the facilities proposed to be replaced have experienced numerous outages that may be related to their vintage or the construction methods used in their installation, and that the facilities have several anomalies that make them prone to future failures, justifying their replacement.[50]

27.     Regarding Antero Parties' concern about the design and size of the replacement facilities, Commission staff conducted a review of ANR's flow diagrams and hydraulic models, and found that ANR's Wisconsin Reliability Project is properly designed to deliver 132,000 Dth/d of incremental transportation capacity to various project delivery points in ANR's Northern Segment.  As stated above, ANR explains that it designed the proposed facilities to support the daily incremental entitlements and the hourly incremental entitlements of the project shippers so that it can fulfill its obligation to provide non-ratable takes.[51]  Further, the Commission has not required specific findings of necessity for maintenance, nor does the Commission require a demonstration that a proposal comply with a government mandate in order to authorize projects.[52]  As

---

[48] *Id.*

[49] Application at 10; ANR September 22, 2023 Data Response at 2-3, 8-10.

[50] ANR September 22, 2023 Data Response at 2-3, 8-10.

[51] ANR April 3, 2023 Answer at 4-5.

[52] *See, e.g.*, *Columbia Gas Transmission, LLC*, 182 FERC ¶ 61,171 (2023) (approving project that would provide incremental capacity and improve reliability); *ANR Pipeline Co.*, 171 FERC ¶ 61,233 (2021); *Tenn. Gas Pipeline Co., LLC*, 169 FERC ¶ 61,230, at PP 36-37 (2019) (approving project that would improve reliability and

discussed above, here, ANR has sufficiently demonstrated a need for the proposed replacement.[53]

### 3.  Impacts on Existing Customers, Existing Pipelines and Their Customers, and Landowners and Surrounding Communities

28.  We find that the Wisconsin Reliability Project will not adversely affect service to ANR's existing customers.  ANR designed the project to provide additional, reliable firm transportation service to the shippers without impacting services to existing customers.  Here, the project shippers are all existing customers of ANR.[54]  Further, the project is not intended to replace existing service but will provide additional incremental service to the shippers.[55]  We also find that there will be no adverse impact on other pipelines in the region or their captive customers because the project will not displace existing service on other pipelines.  No pipelines or their captive customers have objected to ANR's proposal.

29.  Additionally, in reviewing the flow diagrams and corresponding hydraulic models ANR provided in response to the July 12 data request, Commission staff confirmed that the project is designed appropriately to meet additional customer demand while maintaining and improving the reliability of existing services.  Therefore, ANR's upgraded system, as proposed, is appropriately sized and will be able to adequately improve reliability and meet increased demand with no adverse operational impacts on existing customers.

30.  We are further satisfied that ANR has taken appropriate steps to minimize adverse economic impacts on landowners and surrounding communities.  ANR designed the project to fit primarily within its existing footprint, thus limiting the extent of potential

---

provide additional flexibility); *Southern Natural Gas Co*., 116 FERC ¶ 62,035, at 64,090 (2006) (approving project that would ensure system integrity and operational reliability).

[53] We note that, while in prior orders the Commission may have relied on an applicant's uncontested claim that its replacement project would improve system reliability, an unsupported claim that a proposal will improve reliability, alone, is not sufficient justification for a replacement project.  Here, in response to Commission staff data requests, ANR provided sufficient explanation as to why the replacement project was needed.

[54] Application at 27.

[55] *Id.*

project impacts on landowners.[56]  ANR has taken steps to facilitate communication with landowners in effort to address and minimize concerns.[57]  Although construction of the proposed Wisconsin Reliability Project will require a total of about 1,044.3 acres of land, ANR will permanently maintain 503.1 acres of land for operation of its facilities.[58]

31.     In sum, the project will not have adverse impacts on ANR's existing shippers or on other pipelines and their existing customers and will have minimal economic impacts on the interests of landowners and surrounding communities.  Therefore, we conclude that the project is consistent with the criteria set forth in the Certificate Policy Statement and analyze the environmental impacts of the project below.[59]

### C.     Rates

#### 1.     Expansion Facilities

##### a.     Initial Recourse Rates

32.     ANR estimates total project costs to be $757,606,203.  It has allocated $173,027,528 to the new incremental capacity and proposes to charge the maximum base-system (i.e., generally applicable) rates under its existing Rate Schedules FTS-3 and ETS as initial recourse rates for expansion service on the project.  ANR uses a zoned-based rate design, so its base-system recourse rates vary based on zones.  For example, ANR's currently effective maximum recourse reservation charge for Rate Schedule FTS-3 from Zone 7 to Zone 7 is $3.2369 per Dth and a usage charge of $0.0078 per Dth.[60]  Similarly, ANR's currently effective maximum recourse reservation charge for Rate

---

[56] *Id.*

[57] *Id.* at 28.  *See* EA at 64-66.

[58] Application at Resource Report 1, tbl. 1.2-1.

[59] *See* Certificate Policy Statement, 88 FERC at 61,745-46 (explaining that only when the project benefits outweigh the adverse effects on the economic interests will the Commission then complete the environmental analysis).

[60] ANR Company, ANR Tariffs, § 4.6 (Statement of Rates, Rate Schedule FTS-3) (3.0.1).

Document Accession #: 20231219-3072     Filed Date: 12/19/2023

Schedule ETS from Zone 7 to Zone 7 is $7.399 per Dth and a usage charge of $0.0078 per Dth.[61]

33.     On May 31, 2023, in response to a Commission staff data request, ANR provided illustrative incremental rates by zone.  Page 2 of Exhibit N of the data response lists an illustrative incremental reservation charge of $5.2908 per Dth and a usage charge of $0.0064 per Dth for Rate Schedule FTS-3 from Zone 7 to Zone 7.  Similarly, page 2 of Exhibit N lists the illustrative incremental reservation charge of $11.5077 per Dth and a usage charge of $0.0064 for Rate Schedule ETS from Zone 7 to Zone 7.

34.     Under the Commission's Certificate Policy Statement, there is a presumption that incremental rates should be charged for proposed expansion capacity if the incremental rate exceeds the maximum system recourse rate.[62]  As shown above, the illustrative incremental reservation charges for Rate Schedules FTS-3 and ETS from Zone 7 to Zone 7 plus the illustrative incremental usage charges are significantly higher than the comparable maximum system reservation charges plus the maximum system usage charges in ANR's tariff.  This is also true for all of the other proposed firm illustrative incremental transportation rates for these rate schedules by various zones.  Therefore, we reject ANR's proposal to use its generally applicable system rates under Rate Schedules FTS-3 and ETS from Zone 7 to Zone 7, as initial recourse rates for incremental expansion service on the project and instead will require ANR to use the incremental charges as reflected on page 2 of Exhibit N of ANR's May 31, 2023 data response as its initial recourse charges under Rate Schedules FTS-3 and ETS of its tariff for expansion service on the project.

### b.     Transporters Fuel Use and Electric Power Charge

35.     ANR proposes to apply its generally applicable system Transporters Use percentage and an incremental electric power cost (EPC) to the shippers that have subscribed to the expansion capacity.  These surcharges consist of the (1) Transporters Use percentage, through which ANR recovers company-use gas, including the fuel for gas-fired compression, and lost and unaccounted for quantities, and (2) EPC Charges, reflecting electric power costs incurred by ANR to power the project's compressor units.  ANR states that the increased billing determinants and a reduction in company-use gas due to the replacement of existing gas-fired compressors with hybrid units is expected to

---

[61]  ANR Company, ANR Tariffs, § 4.1 (Statement of Rates, Rate Schedule ETS) (3.0.1).

[62]  Certificate Policy Statement, 88 FERC at 61,745.

Document Accession #: 20231219-3072    Filed Date: 12/19/2023

cause a decrease in the Transporters Use percentage in the Northern Segment (Zone 7) by 0.02%.[63]

36.    ANR states that the increased electric costs associated with the new hybrid units that will run exclusively as electric drive during normal operating conditions causes an increase in the EPC Charge in the Northern Segment (Zone 7).  Therefore, ANR's proposed initial incremental EPC Charge in the Northern Segment (Zone 7) for shippers subscribing to the project expansion capacity is $0.0034, which is above the current system EPC Charge of $0.0008 for the Northern Segment (Zone 7).[64]

37.    Because the project facilities would yield a net system fuel benefit to the existing system customers without subsidization, we will approve ANR's proposal to charge its generally applicable system Transporters Use percentage.  We will also approve the proposed incremental EPC Charge for shippers subscribing to the project expansion capacity since the incremental EPC Charge is higher than the system EPC Charge, in order to prevent subsidization from existing system customers.

### 2.    **Replacement Facilities**

### a.    **Pre-Determination of Rolled-In Rate Treatment**

38.    ANR proposes to allocate $584,578,675 of the total project costs to the replacement component of the project, to be recovered from its existing customers through system rates.  ANR states that this would have been the cost, absent the request for incremental service, of replacing segments PL-1, PL-2, PL-3, associated compression, and auxiliary facilities (Replacement Facilities) to meet existing customer needs.[65]  ANR

---

[63] Application, Ex. Z-3 at 2.

[64] *Id.* at 3.

[65] June 7, 2023 Data Request Response, Ex. K (ANR provides a breakout of the costs according to replacement needs and incremental service).

states that a "like-for-like equivalency cost allocation method"[66] was used to determine the estimated stand-alone costs for the replacement of the facilities.[67]

39.     ANR asserts that the Commission should grant a predetermination that in its next general NGA section 4 rate proceeding it may roll in the replacement costs.  ANR states that the Replacement Facilities will replace and upgrade existing pipeline facilities with new, more efficient facilities to provide safe and reliable natural gas transportation service thereby benefiting existing customers.[68]

<u>Comments and Protests</u>

40.     On December 19, 2022, and again on March 27, 2023, Antero Parties filed comments questioning the allocation of costs for the Replacement Facilities.  Antero Parties state that ANR proposes to allocate approximately $584.6 million to the replacement portion of the project, which will ultimately be borne by existing shippers rather than expansion shippers, and that ANR did not provide sufficient detail or explanation regarding the need to replace the facilities.[69]

41.     Antero Parties also question the method for the project cost allocation, noting that ANR has only stated that a "like-for-like" equivalency method was used to arrive at its high-level allocation of expansion and replacement costs in Exhibit K.  Antero Parties assert that the proposal provides inadequate information for the Commission to determine where costs are appropriately allocated between the replacement and expansion components, particularly where the pipeline seeks to allocate nearly $600 million of the project costs to existing system shippers.[70]

---

[66] Under a "like-for-like" equivalency cost allocation method, the estimated cost of recreating the existing capacity/function provided by a pipeline segment or compressor to be replaced is allocated to existing customers and the remainder of the costs related to the replacement facilities is allocated to the incremental expansion shippers.

[67] Application at 21-22 (citing *Dominion Transmission, Inc.*, 129 FERC ¶ 61,048, at P 25 (2009); *ANR Pipeline Co.*, 171 FERC ¶ 61,233, at P 19 (2021)).

[68] Application at 31.

[69] Antero Parties Dec. 19, 2022 Comments at 3.

[70] *Id.* at 4-5.

Answers to Comments and Data Response

42.     ANR argues that Commission policy endorses its proposed methodology for allocation of the project's costs between non-incremental system rates and an incremental rate.[71]  ANR asserts that the allocation methodology it proposes is just and reasonable.[72]  ANR states that the Commission has granted predeterminations of rolled-in rate treatment for similar projects.  For example, in *Paiute* the Commission determined that the "cost of new and/or replacement facilities designed to maintain and improve existing service and enhance system reliability and flexibility for the benefit of all customers is not considered a subsidy."[73]

43.     Additionally, on June 13, 2023, in response to a Commission data request, ANR stated that its proposed methodology, evaluating the cost of a "like-for-like" replacement at the Kewaskum compressor station, Weyauwega compressor station, line 301-1, line 301-2, line 226-3, and the total cost of the project facilities, is consistent with Commission precedent.[74]  ANR also provided workpapers that reflect the cost information contained in Exhibit K of ANR's application, along with additional detail including supporting calculations for estimating costs and allocations between the replacement and expansion functions of facilities.[75]

Commission Determination

44.     Commission policy recognizes that existing customers should pay the costs of projects designed to improve their service by replacing existing capacity, improving reliability, or providing additional flexibility.[76]  Since issuing the Certificate Policy Statement, the Commission has consistently found that existing shippers generally should not pay for the costs of incremental expansions.  However, that policy does not mean that existing shippers should not be allocated the full costs associated with replacement facilities, even when the replacement projects are paired with incremental expansions.

---

[71] ANR Jan. 7, 2023 Answer at 7-9 (citing *Paiute Pipeline Co.*, 104 FERC ¶ 61,078 (2003) (*Paiute*); *Dominion Transmission, Inc.* 129 FERC ¶ 61,048 (2009)).

[72] *Id.* at 7, referring to Exhibit K of the Application.

[73] *Id.* at 8 (citing *Paiute,*104 FERC ¶ 61,078 at P 40).

[74] ANR June 13, 2023 Data Request Response at 2.

[75] *Id.* at attach. A.

[76] Certificate Policy Statement, 88 FERC ¶ 61,227 at n.12, *clarified*, 90 FERC at 61,393.

As stated in *Paiute*, if we held the expansion shipper responsible for contributing to the replacement costs simply because the two projects are constructed concurrently, then the expansion shipper, in essence, would be subsidizing the existing shippers for the replacement facilities.[77]

45.    The record supports a finding that the replacement of the existing facilities will provide service that is more reliable and less susceptible to integrity-driven outages. ANR's allocation of costs between the replacement and incremental expansion functions associated with the project are consistent with Commission policy and precedent.[78]  In *Paiute* as well as *Dominion Transmission, Inc., and Columbia Gas Transmission, LLC*, the Commission determined that a "like-for-like" equivalency cost allocation method was acceptable for determining the costs of proposed replacement facilities to be allocated to existing customers.[79]  Therefore, we find that protesters have not demonstrated why ANR's cost allocation proposal is inconsistent with Commission precedent.

46.    To support a request for a predetermination that a pipeline may roll the costs of a project into its system-wide rates in its next NGA section 4 rate proceeding, a pipeline must demonstrate that rolling in the costs associated with the construction and operation of new facilities will not result in existing customers subsidizing the expansion.  The Certificate Policy Statement recognized the appropriateness of rolled-in rate treatment for the costs of facilities constructed to improve the reliability of service to existing customers or to improve service by replacing existing capacity, rather than to increase levels of service.[80]  Here, ANR states that the portion of the capacity provided by the Replacement Facilities will ensure that ANR is able to continue to provide safe and reliable service to its customers, and we agree.  Accordingly, we grant ANR a predetermination that it may roll the replacement component portion of the project costs into its system rates in a future NGA section 4 rate case, absent a significant change in circumstances.

### 3.    Reporting Incremental Costs

47.    Section 154.309 of the Commission's regulations includes bookkeeping and accounting requirements applicable to all expansions for which incremental rates are

---

[77] *Paiute*, 104 FERC ¶ 61,078 at P 30.

[78] *See, e.g.*, *Columbia Gas Transmission, LLC*, 182 FERC ¶ 61,171 at PP 25-27.

[79] *Paiute*, 104 FERC ¶ 61,078 at P 27; *Dominion Transmission, Inc.*, 129 FERC ¶ 61,048 at PP 26-27; and *Columbia Gas Transmission, LLC*, 185 FERC ¶ 61,130, at PP 61-62 (2023).

[80] Certificate Policy Statement, 88 FERC ¶ 61,227 at n.12.

charged. The requirements ensure that costs are properly allocated between pipelines' existing shippers and incremental expansion shippers.[81] Therefore, we will require ANR to keep separate books and accounting of costs and revenues attributable to the incremental, expansion capacity created by the project as required by section 154.309 and internally for the Replacement Facilities in the same manner as required by section 154.309 of the Commission's regulations.[82] The books should be maintained with applicable cross-reference and the information must be in sufficient detail so that the data can be identified in Statements G, I, and J in any future NGA section 4 or 5 rate case, and the information must be provided consistent with Order No. 710.[83]

### D.   Environmental Analysis

48.    On April 4, 2022, Commission staff began its environmental review of the Wisconsin Reliability Project by granting ANR's request to enter into the Commission's pre-filing review process, assigning pre-filing Docket No. PF22-5-000.[84] The Commission's pre-filing process is designed to encourage early involvement by citizens, governmental entities, non-governmental organizations, and other interested parties in the development of proposed natural gas transmission projects, prior to the filing of a formal application. During the pre-filing review, the Commission issued a *Notice of Scoping Period Requesting Comments on Environmental Issues for the Planned Wisconsin Reliability Project* (Notice of Scoping) on July 8, 2022, establishing a 30-day public scoping period. The Notice of Scoping was published in the *Federal Register* on July 14, 2022,[85] and mailed to stakeholders on Commission staff's environmental mailing list for the project including federal, state, and local agencies; elected officials; environmental and public interest groups; Native American Tribes; potentially affected landowners; local libraries and newspapers; and other stakeholders who had indicated an interest in the project.

49.    In response to the Notice of Scoping, the Commission received comments from the National Park Service (NPS), the U.S. Environmental Protection Agency (EPA), local Wisconsin officials on behalf of Washington and Waukesha Counties, the Wisconsin

---

[81] 18 C.F.R. § 154.309 (2022).

[82] *Id.*

[83] *See Revisions to Forms, Statements, & Reporting Requirements for Nat. Gas Pipelines*, Order No. 710, 122 FERC ¶ 61,262, at P 23 (2008).

[84] ANR, Letter, Docket No. PF22-5-000 (issued April 4, 2022); *see also* 18 C.F.R. § 157.21(b) (2022).

[85] 87 Fed. Reg. 42,173 (July 14, 2022).

Department of Agriculture, Trade and Consumer Protection (Wisconsin DATCP), nine Wisconsin state representatives and senators, Wisconsin Infrastructure Investment Now, Inc., Illinois Manufacturers' Association, businesses, and landowners. The Leech Lake Band of Ojibwe filed comments stating that no known recorded sites of religious or cultural importance are in the project area.[86] Commission staff held two virtual scoping meetings by telephone on July 27 and 28, 2022, during which five individuals provided comments. The primary issues raised by commenters during the scoping process included concerns about tree clearing; abandoning the existing pipeline in place; and impacts on wetlands, agriculture, vegetation, wildlife, recreation areas, air quality, climate change, greenhouse gases (GHG), and land use. The pre-filing process ended on November 14, 2022, when ANR filed its application.

50.    On January 30, 2023, the Commission issued a *Notice of Schedule for the Preparation of an Environmental Assessment for the Wisconsin Reliability Project.* The notice was published in the *Federal Register* on February 3, 2023,[87] and mailed to stakeholders on the project environmental mailing list.

51.    To satisfy the requirements of the National Environmental Policy Act of 1969 (NEPA),[88] Commission staff prepared an EA for ANR's proposal, which was issued on July 21, 2023. The notice of availability for the EA, which was mailed to the environmental mailing list, established a 30-day comment period. The analysis in the EA addresses geology, soils, water resources and wetlands, fisheries, vegetation, wildlife, threatened and endangered species, land use, visual resources, environmental justice,[89] cultural resources, air quality, noise, safety, cumulative impacts, and alternatives. All substantive comments received in response to the Notices and during the scoping process were addressed in the EA. The U.S. Army Corps of Engineers (Corps), EPA, Wisconsin

---

[86] Leech Lake Band of Ojibwe October 3, 2022 Comment, Docket No. PF22-5-000.

[87] 88 Fed. Reg. 7435 (Feb. 3, 2023).

[88] 42 U.S.C. §§ 4321 *et seq. See also* 18 C.F.R. pt. 380 (2022) (Commission's regulations implementing NEPA).

[89] Under NEPA, the Commission considers impacts to all potentially affected communities. Consistent with Executive Order 12,898 and Executive Order 14,008, the Commission separately identifies and addresses "disproportionately high and adverse human health or environmental effects" on environmental justice communities. Exec. Order No. 12,898, 59 Fed. Reg. 7629 (Feb. 11, 1994); Exec. Order No. 14,008, 86 Fed. Reg. 7619 (Jan. 27, 2021). *See infra* PP 95-152.

Document Accession #: 20231219-3072          Filed Date: 12/19/2023

Department of Natural Resources (Wisconsin DNR), and Wisconsin DATCP participated as cooperating agencies in the preparation of the EA.

52.     In response to the EA, the Commission received comments from EPA, the Sokaogon Chippewa Community, ANR, the Village of Menomonee Falls, America Farms Inc., the Lenser Farm landowners, and nine members of the public relaying general concerns with the project.  Additionally, Wisconsin State Representative Janel Brandtjen filed comments in support of the project.  The comments included concerns regarding waterbodies and wetlands; vegetation, wildlife, and natural areas; land use; cultural resources; air quality and noise; alternatives; and environmental justice, which are addressed below.

53.     After Commission staff issued the Notice of Scoping, Congress enacted the *Fiscal Responsibility Act of 2023*.[90]  A section titled "Builder Act" amended NEPA in several ways.[91]  NEPA section 102(c), as amended, requires that agencies prepare NEPA documents on:

> **(i)** reasonably foreseeable environmental effects of the proposed agency action;
>
> **(ii)** any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented;
>
> **(iii)** a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal;
>
> **(iv)** the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and

---

[90] *See* FISCAL RESPONSIBILITY ACT OF 2023, PL 118-5, 137 Stat 10 (June 3, 2023).  The Commission relied on the *Fiscal Responsibility Act of 2023* in a recent order. *See Mountain Valley Pipeline, LLC*, 183 FERC ¶ 61,221, at PP 7, 9, 11 n.20 (2023).

[91] *See* FISCAL RESPONSIBILITY ACT OF 2023, PL 118-5, 137 Stat 10, at § 321 (June 3, 2023) (providing the "Builder Act").

(v) any irreversible and irretrievable commitments of Federal resources which would be involved in the proposed agency action should it be implemented.[92]

The Commission has complied with its NEPA responsibilities under both versions of the statute.[93]

## 1.     General Comments

54.     In its comments on the EA, EPA inaccurately describes the EA as a draft document and recommends that the Commission address its comments in the final EA.[94] As a clarification, the Commission does not issue a draft and final EA for natural gas proposals.[95]  Rather, the Commission addresses comments received on EAs in its orders.

55.     EPA further comments that the "non-jurisdictional facilities" disclosed in the EA (i.e., future construction of a transmission/distribution line and new substation to provide power to the existing Kewaskum Compressor Station) are connected actions to ANR's proposal and should be analyzed.[96]  We find that the potential impacts of the non-jurisdictional electric transmission line and substation are sufficiently addressed in the EA's cumulative impacts section.[97]

56.     EPA requests that the Commission clarify whether ANR will leave in place the new access roads following construction.[98]  As described in section A.4.3 of the EA, ANR will leave the new roads and road improvements in place following construction,

---

[92] 42 U.S.C. § 4332(c)(i).

[93] We note that the Council on Environmental Quality recently published a Notice of Proposed Rulemaking to revise its regulations implementing NEPA, including to implement the Builder Act amendments.  88 Fed. Reg. 49,924 (July 31, 2023).  The Commission will monitor this proceeding to inform the Commission's practices going forward.

[94] EPA August 21, 2023 Comments at 1.

[95] Neither the Commission's nor the Council on Environmental Quality's regulations implementing NEPA require doing so.

[96] *Id.* at 3.

[97] *See* EA at § B.11 (noting that the route of the transmission line and the location for the substation have not yet been determined).

[98] EPA August 21, 2023 Comments at 5.

Document Accession #: 20231219-3072    Filed Date: 12/19/2023

except in wetlands or unless otherwise requested by the landowner or land-managing agency.[99]  The EA included the operational impacts for access roads in table B.5-1 and conservatively assumed that ANR would leave in place all new roads and road improvements.[100]

57.    EPA recommends that the Commission require ANR to evaluate remedial alternatives with landowners to reduce impacts to private surface water ponds and to implement agreed-upon remedial activities; discuss how and when residents will be informed of the construction periods; and include a factsheet of all protective measures required for project construction and a telephone number residents can call if contractors are not following the protective measures.[101]  As described in section B.3.2 of the EA, ANR proposes to implement its Well and Pond Monitoring and Septic System Plan to minimize impacts on ponds.[102]  In the proposed plan, ANR commits to evaluate remedial alternatives with landowners if a private surface water pond is impacted as a result of ANR's construction activities.  ANR has proposed to notify residents by letters, phone, or in person of planned construction activities at least seven days prior to scheduled construction unless more advanced notice is required and identified in an agreement with the landowner.  Landowner notification for residences within 25 feet of the construction workspace is also addressed in the site-specific residential construction plans in EA appendix C, part 2.[103]  Protective measures are described in appendix C, part 1, and section B of the EA.[104]  Further, the EA included an environmental complaint resolution procedure as a recommended condition[105] that we include as Environmental Condition 9 in the appendix to this order.  The condition requires ANR to develop, for review and approval by the Director of the Office of Energy Projects (OEP) or by the Director's designee, a procedure to provide landowners with clear and simple directions for identifying and resolving their problems and concerns during project construction, which would include impacts on surface water ponds.

---

[99] EA at § A.4.3.

[100] *Id.* at 45.

[101] EPA August 21, 2023 Comments at 6.

[102] EA at § B.3.2.

[103] *Id.* at app. C, pt. 2.

[104] *Id.* at app. C, pt. 1.

[105] *Id.* at 137.

Document Accession #: 20231219-3072     Filed Date: 12/19/2023

58.     EPA requests that the EA include the plans and procedures developed to minimize impacts of construction as an appendix or provide a web link to these documents so that agencies and the public can understand the extent of protection afforded by the plans mentioned in the EA.[106]  The Commission's *Upland Erosion Control, Revegetation, and Maintenance Plan* (Plan) and *Wetland and Waterbody Construction and Mitigation Procedures* (Procedures) are both available on the Commission's website.[107]  ANR has committed to implement the best management practices included in the Commission's Plan and Procedures.  Table B6 in appendix B of the EA also provides a list of 18 construction, mitigation, and restoration plans specific to the project, with links to the Commission's website and the eLibrary accession numbers under which the plans can be found.[108]

59.     ANR requests that we modify recommended environmental condition 11, which states, "ANR must receive written authorization from the Director of OEP, or the Director's designee, before placing the Project into service.  Such authorization would only be granted following a determination that rehabilitation and restoration of the right-of-way and other areas affected by the Project are proceeding satisfactorily."[109]  ANR asks that we modify this recommendation to allow new facilities to be placed in service to deliver existing certificated volumes and maintain contractual obligations without written authorization from the Director of OEP, and that written authorization only apply to the delivery of the newly certificated volumes of gas.[110]  Requiring ANR to receive written authorization before placing modified and new facilities into service ensures that the Commission has the opportunity to affirm ANR's compliance with the project authorization, in order to meet ANR's existing system deliveries as well as the increased gas volumes provided by the project.  Thus, we will not modify the recommended condition. We include it as Environmental Condition 11 in the appendix to this order.

60.     Additionally, ANR requests that we modify recommended environmental condition 13, regarding the proposed Wolf River and Jenny Bayou horizontal directional drill (HDD) between Mileposts (MP) 70.8 and 72.0 and outstanding information needed

---

[106] EPA August 21, 2023 Comments at 6.

[107] *See* FERC, *Natural Gas:  Environmental Guidelines* (Mar. 2023), https://www.ferc.gov/industries-data/natural-gas/environmental-overview/environmental-guidelines.

[108] EA at B-30.

[109] *Id.* at 138.

[110] ANR August 21, 2023 Comments at 2.

Document Accession #: 20231219-3072          Filed Date: 12/19/2023

before construction of the HDD.[111]  Specifically, ANR requests that we modify the recommendation such that the Commission could consider approving other construction work not related to the HDD in advance of ANR's compliance with the recommended condition 13 stipulations.  Upon consideration of ANR's request, we have modified the recommendation, included as Environmental Condition 13 in the appendix to this order, to clarify that ANR must provide the outstanding HDD information before the Commission approves construction of the HDD.  With this modification, the Commission could consider approving construction of the remaining project facilities before ANR meets the stipulations of Environmental Condition 13.

61.     ANR further requests that we modify the EA's recommended environmental condition 15, which states, "Prior to construction, ANR shall file with the Secretary documentation of landowner or land-managing agency agreement for any new temporary access roads that would be left in place following construction,"[112] to instead state: "Prior to restoration completion on any tract where a new temporary access road will be left in place following construction, ANR shall file with the Secretary documentation of landowner or land-managing agency any agreements for leaving access roads in place."[113]  As stated in the EA, ANR plans to build 13 new roads to access the project construction workspace, and ANR has stated that it plans to leave the new roads in place following construction.[114]  Commission staff included the recommended condition to ensure that landowners and land-managing agencies are aware that ANR plans to leave the temporary access roads in place following construction and to ensure that the landowners have an opportunity to request removal of these access roads.  Further, it is possible that ANR may design the access roads differently if it knows in advance that the roads will ultimately be removed.  Therefore, we find that the recommended condition does not require revision, and it is included as Environmental Condition 15 in the appendix to this order.

## 2.     Waterbodies and Wetlands

62.     In its comments on the EA, EPA requests that the Commission show how the project avoids impacts to water resources and wetlands and, where avoidance is impossible, minimizes and mitigates these impacts to the extent practicable, in

---

[111] EA at 138.

[112] *Id.* at 139.

[113] ANR August 21, 2023 Comments at 3.

[114] EA at 46.

Document Accession #: 20231219-3072     Filed Date: 12/19/2023

compliance with the Clean Water Act (CWA).[115]  EPA also requests clarification on other permits and consultations required for the project and recommends inclusion of any final wetland mitigation plan in the EA.

63.     The EA describes the measures ANR proposes to implement to avoid or minimize impacts on wetlands and waterbodies, including its proposal to install about 80% of the replacement pipeline parallel to existing rights-of-way or within the same footprint of the existing pipeline segment.[116]  ANR has committed to follow measures in the Commission's Plan and Procedures, which provide baseline construction and mitigation measures developed to minimize the impacts of construction on upland areas, wetlands, and waterbodies.[117]  In addition, ANR has developed project-specific construction, mitigation, and restoration plans to further minimize impacts.[118]  Section B.3 of the EA describes waterbody and wetland impacts and ANR's general construction and mitigation measures that will be employed to lessen these impacts.[119]  In consultation with the Corps and Wisconsin DNR, ANR is also currently developing a Wetland Restoration Plan for pipeline segment replacements PL-2 and PL-3 that will include measures for reestablishing herbaceous and/or woody species, and ANR commits to filing the plan with the Commission prior to construction.[120]  Therefore, we conclude that the EA properly described how the project will avoid, minimize, and mitigate impacts on waterbodies and wetlands.

64.     Regarding EPA's comment concerning permits and consultations, the EA lists the major federal and state permits, approvals, and consultations for construction and operation of the project, including the CWA, and the status of each.[121]  The EA indicates that ANR will be responsible for obtaining and abiding by all permits and approvals required to construct and operate the project regardless of whether they appear in the

---

[115] EPA August 21, 2023 Comments at 3.

[116] EA at 10.

[117] *Id.* at 11.

[118] *Id.* at B-30.

[119] *Id.* at app. B, tbl. B14.  *See also id.* at 28 ("[dry, open-cut] crossing methods would avoid or minimize impacts on the waterbodies compared to a wet, open-cut crossing method."); *id.* at 29 ("ANR has minimized the amount of permanent [wetland] fill to the extent feasible given operational and safety constraints."); and *id.* at 31.

[120] *Id.* at 31.

[121] *Id.* at app. B, tbl. B8.

Document Accession #: 20231219-3072    Filed Date: 12/19/2023

EA.[122]  Further, pursuant to Environmental Condition 10 in the appendix to this order, ANR is required to file documentation that it has received all applicable authorizations required under federal law, prior to commencing abandonment or construction activities. Mitigation required by state and/or other federal agencies will be addressed as part of those agencies' permitting processes, including the Wetland Restoration Plan, which is being developed by ANR in consultation with the Corps and Wisconsin DNR.  The Corps and Wisconsin DNR will determine mitigation ratios and compensatory mitigation requirements associated with the CWA Section 404(b)(1) permit, including measures for reestablishing herbaceous and/or woody species, controlling the invasion and spread of invasive species and noxious weeds, and monitoring the success of the revegetation and weed control efforts in wetlands.[123]  We note that the Commission's Procedures include measures that require ANR to reestablish and monitor wetlands to ensure they are successfully revegetated with herbaceous and/or woody plant species, and ANR has developed a project-specific Noxious Weed Management and Control Plan.[124]  ANR has committed to filing the Wetland Restoration Plan with the Commission prior to construction.  Therefore, we find that the permits and approvals required to construct and operate the project have been appropriately considered.

### 3.    Vegetation, Wildlife, and Natural Areas

65.    EPA requests clarification regarding why impacts to interior forest habitat were not avoided in instances when existing road or utility rights-of-way were available for pipeline construction and requests that the Commission identify what measures were taken to avoid interior forest habitat.[125]  As stated above, about 80% of the proposed pipeline will be installed either parallel to existing pipeline, utility, or road rights-of-way or within the same footprint of the existing pipeline segment to be replaced. Additionally, the project is collocated with previously cleared rights-of-way to the extent practicable to minimize and avoid disturbance to interior forest or other undisturbed habitats.  As described in section A.4.1 of the EA, in most locations along Segments PL-1 and PL-2, pipeline replacement would involve excavating the existing pipeline, removing it from the ground, and installing the new pipeline in the same trench.[126]  For most of Segment PL-3, ANR would install the replacement pipeline adjacent to (offset approximately 25 feet from) the existing pipeline.  The replacement pipeline diverges

---

[122] *Id.* at 13.

[123] *Id.* at 31.

[124] *Id.* at 42 and B-30 in Appendix B.

[125] EPA August 21, 2023 Comments at 5.

[126] EA at 9.

Document Accession #: 20231219-3072     Filed Date: 12/19/2023

from the existing pipeline in relatively short segments, mainly to avoid dense residential areas to minimize impacts on residences and as required for the Jenny Bayou and Wolf River HDD alignment to limit surface disturbance between the drill entry and exit points.

66.     As indicated in the EA, the project would cross one large interior forest patch, totaling 14.3 acres, in six separate locations along pipeline Segment PL-1 in McHenry County, Illinois.[127]  The EA states that the proposed route within these interior forested habitat locations is within 25 to 100 feet of the existing forest edge near residential properties and road rights-of-way or within or near existing utility rights-of-way. Because the proposed route is located near the existing forest edge or within areas of existing fragmentation, the EA concludes that the net increase in fragmentation would be minimal and interior forested patches would not be appreciably reduced or degraded on a landscape level.[128]  Segment PL-1 was designed to minimize new disturbances and fragmentation by remaining within the existing right-of-way except in specific areas where commercial or residential development encroached on the existing pipeline alignment and new pipeline installation could not occur in the same trench.  We find that ANR collocated the project pipeline segments with previously cleared rights-of-way to the extent practicable to minimize and avoid disturbance to interior forest.

67.     EPA recommends the use of fast-growing plant species (e.g., rye) to stabilize disturbed areas during restoration followed by the use of native seed mix, as well as pollinator-friendly species as requested by landowners or land-managing agencies.[129] EPA suggests working with the Wisconsin DNR, Illinois Department of Natural Resources, and local park districts regarding native tree planting and specifically requests a response to concerns raised by the Homestead Hollow County Park managers about disruption to current park operations and trails and potential impacts to coniferous forest and pollinator/prairie habitat.[130]  EPA also recommends that the EA discuss whether the route across the Homestead Hollow County Park can be revised to avoid the area or whether it is feasible for ANR to employ an HDD to eliminate impacts to park resources.[131]

68.     The Commission's Plan requires successful revegetation but defers the determination of specific seed mixes or tree planting plans to local soil conservation

---

[127] *Id.* at 33-34.

[128] *Id.* at 34.

[129] EPA August 21, 2023 Comments at 6.

[130] *Id.*

[131] *Id.*

Document Accession #: 20231219-3072     Filed Date: 12/19/2023

authorities, landowners, and land-managing agencies. As described in section B.4.1 of the EA, ANR proposes to seed disturbed areas using native seed mixes requested by landowners and land-managing agencies.[132] Where landowners or land-managing agencies request native nectar-producing or pollinator-friendly species (e.g., Homestead Hollow County Park), ANR will make efforts to accommodate those requests. However, according to ANR, those species are not best for quickly stabilizing disturbed areas to promote successful restoration, and, therefore, ANR is not planning to emphasize those species in its seed mix.[133]

69.     Regarding tree planting and natural and recreational areas, ANR has committed to coordinate with the landowners and land management agencies to determine a site-specific tree planting plan, as appropriate, during easement negotiations. ANR coordinated with Washington County about the Homestead Hollow County Park to identify an appropriate route across the park, conduct a tree inventory, determine preferred seed mixes and restoration measures, and develop a site-specific crossing plan.[134] ANR filed with the Commission the site-specific crossing plan and a community-specific outreach plan for Homestead Hollow County Park and has committed to filing documentation of Washington County's final approval of the plans prior to beginning construction.[135]

70.     While the EA considered several route variations within Homestead Hollow County Park near MP 119 along proposed Segment PL-2, an HDD construction method was not evaluated in the EA nor was the method raised as an alternative prior to issuance of the EA or during the scoping process.[136] ANR did, however, route the proposed pipeline alignment within the park to cross the southern portion of the park as recommended by the park officials and the Washington County Natural Resources Department did not comment further on the EA. The proposed route between MPs 117 and 120 diverges from the existing pipeline to avoid a highway interchange and minimize impacts in the village of Germantown. To accommodate an HDD crossing method at the county park crossing, ANR would need to make alignment adjustments to both the south and north of the county park to make an HDD feasible, and those adjustments would

---

[132] EA at 33.

[133] *Id.*; *see* ANR's April 30, 2023 Filing, question 4, in response to staff's May 19, 2023 Environmental Information Request.

[134] *Id.* at 52.

[135] ANR filed the site-specific plans for Homestead Hollow County Park on April 26, 2023.

[136] EA at 126 & 127.

Document Accession #: 20231219-3072    Filed Date: 12/19/2023

require additional landowner consultations with newly affected landowners. As stated in the EA, Commission staff found ANR's proposed pipeline alignment within the park minimizes impacts on park resources and users.[137] We agree.

71.    EPA suggests that the Commission require ANR to minimize impacts to terrestrial and aquatic resources from soil erosion and the spread of invasive species to the extent possible.[138] As indicated in section A.6 of the EA, ANR has committed to following the Commission's Plan and Procedures, which include specific mitigation measures to minimize impacts to terrestrial and aquatic resources.[139] In addition, ANR has developed project-specific construction, mitigation, and restoration plans to further minimize impacts, including a *Spill Prevention, Control, and Countermeasure Plan* and *Noxious Weed Management and Control Plan*.[140] We find the proposed construction and mitigation plans appropriate to minimize impacts to terrestrial and aquatic resources and address EPA's concerns.

72.    EPA requests clarification on the acreage of agricultural land that will be temporarily impacted versus permanently impacted.[141] Tables B.4-2 and B.5-1 of the EA quantify that 973 acres of agricultural land will be impacted within the construction workspace, and 23 acres of agricultural land will be impacted within the permanent right-of-way.[142] As described in sections B.2.6 and B.5.3 of the EA, impacts on agricultural land associated with the pipeline replacement would be temporary, as agricultural practices can continue within the permanent pipeline right-of-way during operations.[143] Only the agricultural land associated with aboveground facilities, which includes 23.1 acres of prime farmland or farmland of statewide importance, would be permanently impacted and converted to industrial use.[144] ANR currently has land ownership rights for

---

[137] *Id.* at 52.

[138] EPA August 21, 2023 Comments at 5.

[139] EA at 11.

[140]  *Id.* at app. B, tbl. B6.

[141] EPA August 21, 2023 Comments at 3.

[142] EA at 33 & 45.

[143] *Id.* at 21 & 48.

[144] *Id.* at 21.

the proposed aboveground facilities and the conversion of land to industrial use would not impact any existing agricultural land use.[145]

73.     ANR notes that the EA states that "ANR would conduct all tree clearing within 3 miles of a positive acoustic detector between November 1 and March 31 to avoid direct impacts on these two bat species[,]"[146] but that it plans to conduct all tree-clearing activities between October 15 and March 31, consistent with U.S. Fish and Wildlife Service guidelines.[147]  The date range provided in the EA comes from ANR's response to a staff information request.[148]  If ANR has received supplementary guidance from the U.S. Fish and Wildlife Service in support of tree clearing activities commencing October 15, once filed, Commission staff will consider this prior to any construction approval and during the outstanding Endangered Species Act consultation, pursuant to Environmental Condition 14 in the appendix to this order.

### 4.     Cultural Resources

74.     ANR requests that recommended environmental condition 17 be revised to allow construction activities, such as tree felling at the upgrades for the existing compressor stations, to start before cultural resources surveys in five remaining tracts to which ANR does not currently have access are completed.[149]  ANR states this change is necessary to support construction starting as early as February 2024 to comply with endangered species restrictions, such as the tree-clearing window for northern long-eared bat.

75.     Cultural resources investigations are incomplete in Wisconsin and Illinois and consultation with the State Historic Preservation Offices (SHPO) is ongoing.  The Commission is required to complete the National Historic Preservation Act Section 106 consultation process prior to any construction approval.  Here, we are not persuaded by ANR's requested revisions to the EA recommended condition.  To ensure that the Commission's responsibilities under Section 106 are met, we find that the existing staff

---

[145] *Id*. at 48-49.

[146] *Id.* at 40.

[147] ANR August 21, 2023 Comments at 2.

[148] *See* ANR's June 16, 2023 Filing, question 4, in response to staff's June 12, 2023 Environmental Information Request ("ANR will conduct all tree clearing within 3 miles of a positive acoustic detector between November 1 and March 31 to avoid direct impacts to this species.").

[149] ANR August 21, 2023 Comments at 2.

recommended condition needs no revision or modifications and we have included the recommendation as Environmental Condition 17 in the appendix to this order.

### 5.   Air Quality

76.     In its comments on the EA, EPA discourages burning vegetation and recommends leaving woody debris near the construction site to serve as wildlife areas or offering material to the nearest landowner/community, further stating that burning vegetation would negatively impact air quality.[150]  Section B.8.3 of the EA discloses an estimate of emissions should ANR conduct open burning of woody debris.[151]  If open burning is required, ANR commits that it will obtain all necessary permits and follow any applicable local and state regulations.

77.     EPA also requests that ANR commit to applicable measures from EPA's Construction Emission Control Checklist that would minimize exposure to emissions by workers and residents.[152]  Commission staff previously asked ANR to state whether it would commit to following the applicable construction emission control measures, and ANR responded that its project application at section 9.1.3 of Resource Report 9, along with the project's Fugitive Dust Control Plan located in Appendix 9C of Resource Report 9, include practicable control measures, many of which are included in EPA's checklist, that ANR proposes to use to reduce construction emissions for the project.  Section B.8.3 of the EA incorporates those measures and lists the procedures committed to by ANR to mitigate exhaust emissions from construction equipment and to control dust during construction.[153]  We agree that the mitigation measures in section 9.1.3 of Resource Report 9 and section 8.3 of the EA include a majority of the items in EPA's Construction Emission Control Checklist.

### 6.   Noise

78.     Should compressor station noise levels exceed a day-night sound level (Ldn) of 55 decibels on the A-weighted scale (dBA) at any nearby noise sensitive areas (NSAs), the EA-recommended condition 19 would require ANR to install additional noise controls to meet the level within 1 year of the in-service date.[154]  EPA recommends that

---

[150] EPA August 21, 2023 Comments at 2.

[151] EA at 91.

[152] EPA August 21, 2023 Comments at 2.

[153] EA at 89.

[154] *Id.* at 140.

the Commission require ANR to install noise controls within 3 to 6 months after determining 55 decibels has been exceeded near NSAs.[155]  We find that a 3- to 6-month timeline may not be feasible for assessing a full load condition based on weather and expected use.[156]  Therefore, the EA-recommended condition 19 is included without revision in the appendix to this order as Environmental Condition 17.

79.    EPA further requests clarification on what measures ANR will be required to implement to reduce noise impacts in areas where pipeline construction is close to residences, particularly for residences within 25 feet of the construction workspace.[157]  Additionally, EPA requests that the Commission require ANR to develop a plan to give residents sufficient notice when activities with higher noise levels will take place and to provide the expected duration of such activities.

80.    As discussed in the EA, ANR proposes to limit project construction to daytime hours where possible to minimize noise impacts; however, elevated noise construction activities that could extend into nighttime hours are primarily associated with HDD operations.[158]  Due to the additional sensitivity of noise during the night, the EA describes mitigation measures to minimize noise impacts during HDD operations and staff included a recommended condition for noise monitoring during nighttime construction activities.[159]  We have adopted the HDD noise recommendation as Environmental Condition 18 in the appendix to this order.  Landowner notification for residences within 25 feet of the construction workspace is specifically addressed in ANR's site-specific residential construction plans included in the EA at appendix C, part 2.  As stated previously and in section B.6.1 of the EA, ANR proposes to notify residents by letters, phone, or in person of planned construction activities at least 7 days prior to scheduled construction unless more advanced notice is required and identified in an agreement with the landowner.[160]  In addition, Environmental Condition 9 requires ANR to provide affected landowners with a complaint procedure and to include in its biweekly construction status report filing with the Commission any landowner concerns and an explanation of how ANR resolved those concerns.

---

[155] EPA August 21, 2023 Comments at 3.

[156] EA at 98.

[157] EPA August 21, 2023 Comments at 3.

[158] EA at 99.

[159] *Id.* at 98 - 100.

[160] *Id.* at 62.

81.     ANR notes that section 9.1 of the EA describes the noise mitigation measures ANR would implement during HDD operations, and clarifies that it proposes to install acoustical barriers and only implement the other listed measures (e.g., silencers, enclosures) if the barriers cannot reduce noise levels to 55 dBA Ldn or lower.  Based on ANR's comments on the EA, we clarify that acoustical barriers would be the primary measure to mitigate noise impacts, and the other measures listed are only required if the barriers cannot reduce noise levels to 55 dBA Ldn or lower as clarified by ANR.

## 7.     <u>Alternatives</u>

82.     America Farms, Inc. (America Farms) operates The Promised Land Ranch + Preserve (Promised Land Ranch), which will be crossed by the project in Waukesha County, Wisconsin.  In their comments on the EA, America Farms and its supporters state that they oppose ANR's proposed Segment PL-2 route between MPs 114.7 and 115.0, noting the existing natural land use attributes, established tree cover, and desire for the community to continue to be able to use the land and forested areas.[161]  Specifically, America Farms and its supporters cite the impact project construction would have on the trails and scenic uses of the Promised Land Ranch.[162]  They request that either ANR provide financial compensation or the Commission approve Route Variation PL-2-VAR2.[163]

83.     As discussed in the EA, both Route Variation PL-2-VAR2 and Route Variation PL-2-B, between MPs 114.7 and 115.0, would reduce impacts on trees used for maple syrup production at The Promised Land Ranch, compared to the route proposed by ANR at this location.[164]  Under both route variations, the pipeline would be routed to the east side of the Fox River to avoid tree clearing and address comments filed by America Farms.  As explained in section C.4 of the EA, the Wisconsin DATCP concluded that Route Variation PL-2-B is best suited to reduce overall impacts to the agricultural operation at this location.[165]  The EA, therefore, included a recommended condition that ANR adopt Route Variation PL-2-B.[166]  In its comments on the EA, ANR agreed with the

---

[161] *See, e.g.*, American Farms August 23, 2023 Comments at 2; Timothy Winter August 11, 2023 Comments at 1; Ann Barrowclift August 15, 2023 Comments at 1.

[162] American Farms August 23, 2023 Comments at 2.

[163] *Id.* at 1.

[164] EA at 130.

[165] *Id.* at 131.

[166] *Id.*

recommendation to adopt Route Variation PL-2-B for the project.[167]  We agree with staff's conclusion that Route Variation PL-2-B is best suited to reduce overall impacts and include the EA's recommendation as Environmental Condition 20 in the appendix to this order.  The Commission has no jurisdiction to address America Farms' request for financial compensation—any settlement negotiations would be between ANR and America Farms.

84.    Matt Carran, Director of Economic Development and Tourism for the Village of Menomonee Falls, asserts that the Commission should require ANR to adopt Route Alternative PL-2-ALT2 between MPs 113.0 and 116.1, stating that the proposed route severely impacts large tracts of land that are proposed for future residential development.[168]  Specifically Mr. Carran states that at MP 115.7 the proposed route creates a second undevelopable path across a large parcel proposed for single family residential development.  Mr. Carran states that Route Alternative PL-2-ALT2 would have the least impact to existing and future residents and disturb less forested wetlands compared to the proposed route.

85.    Shelli Brazgel, on behalf of the Lenser Farm, suggests that the Commission should require Route Alternative PL-2-ALT2 because it would deviate from the existing route less than the proposed route.[169]  Ms. Brazgel notes that both the EA and the Agricultural Impact Statement[170] stress the importance of using existing easements to limit the impact to the environment, land, and landowners.[171]  She also states that Route Alternative PL-2-ALT2 would preserve more natural wetland and forests and reduce the detriment to landowners and future plans.  Furthermore, Ms. Brazgel states that the Lenser Farm area has three existing utility easements, and the proposed route would add a fourth permanent easement that would significantly impact future possibilities of development.[172]

---

[167] ANR August 21, 2023 Comments at 3.

[168] Matt Carran August 30, 2023 Comments at 1.

[169] Shelli Brazgel August 31, 2023 Comments at 1.

[170] Wisconsin DATCP published its Agricultural Impact Statement for the project under ID#4466 on June 30, 2023.  *See* Wisconsin DATCP July 5, 2023 Comments.

[171] Shelli Brazgel August 31, 2023 Comments at 1.

[172] *Id.*

Document Accession #: 20231219-3072    Filed Date: 12/19/2023

86.     Commission staff reviewed the Menomonee Falls current development projects website to ascertain if project facilities would cross known proposed developments.[173] Staff review did not identify any future developments currently planned near the proposed project route between MPs 113.0 and 116.1.  Further, staff review of the current Village of Menomonee Falls Land Use Plan map found the proposed route between MPs 115.1 and 115.9 is generally labeled as floodway and agricultural hold areas rather than as residential land.[174]  Due to the lack of specific information about future development timelines and locations, we cannot confirm if existing development proposals would be impacted by the project along this segment, and our alternatives analysis is based on existing or reasonably foreseeable plan considerations.  From MP 113.0 to MP 115.7, the proposed route is collocated with an electric transmission line corridor, which would help reduce impacts on future land use and aesthetics.  As noted in the EA, Route Alternative PL-2-ALT2 would impact more existing residences over the corresponding segment of the proposed route, including eight additional private land parcels and six additional residences within 50 feet of construction workspaces.[175]  The EA concludes that Route Alternative PL-2-ALT2 does not offer a significant environmental advantage over the corresponding segment of the proposed route.[176]  Further, use of Route Alternative PL-2-ALT2 would result in substantial construction workspace constraints within the dense residential neighborhoods that have developed around ANR's existing pipeline southwest of the Lenser Farm, presenting multiple constructability issues and additional impacts on residents and environment.  For these reasons Route Alternative PL-2-ALT2 was not recommended in the EA.[177]  We agree with this conclusion.  We note that Environmental Condition 5 provides a mechanism for ANR to make route adjustments in consultation with the landowners along this segment prior to construction to minimize the future development concerns raised by both Mr. Carran and Ms. Brazgel.

---

[173] *See* Village of Menomonee Falls, *Current Development Projects*, https://www.menomonee-falls.org/1016/Current-Development-Projects (accessed Nov. 21, 2023).

[174] *See* Village of Menomonee Falls, *Land Use Plan Map*, March 2022, https://www.menomonee-falls.org/DocumentCenter/View/329/Land-Use-Plan-Map?bidId=.

[175] EA at 127.

[176] *Id.*

[177] *Id.* at 125.

Document Accession #: 20231219-3072     Filed Date: 12/19/2023

## 8.     Greenhouse Gas Emissions and Climate Change

87.     NEPA requires agencies to include in NEPA documents reasonably foreseeable environmental effects of the proposed agency action.[178]  The Council on Environmental Quality (CEQ) defines effects or impacts as "changes to the human environment from the proposed action or alternatives that are reasonably foreseeable," which includes those effects that "occur at the same time and place" and those that "are later in time or farther removed in distance, but are still reasonably foreseeable."[179]  An impact is reasonably foreseeable if it is "sufficiently likely to occur such that a person of ordinary prudence would take into account in reaching a decision."[180]

88.     We find that the project's construction, direct operational emissions, and the emissions from the downstream combustion of the gas transported by the project are reasonably foreseeable.  The EA estimates that construction of the project may result in emissions of up to about 33,014 metric tons of carbon dioxide equivalents ($CO_2e$) over the duration of construction.[181]  The project's estimated operational GHG emissions are expected to be reduced by 13,660 metric tons per year (tpy) of $CO_2e$, compared to pre-project levels.[182]  With respect to downstream emissions, staff explains in the EA that the gas transported by the project to local distribution companies and utility providers would be combusted in Wisconsin and Illinois, and the reasonably foreseeable downstream

---

[178] *See* FISCAL RESPONSIBILITY ACT OF 2023, PL 118-5, 137 Stat 10, at § 321 (June 3, 2023).

[179] 40 C.F.R. § 1508.1(g) (2022).

[180] *Id.* § 1508.1(aa).  *See generally Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004) (explaining that "NEPA requires 'a reasonably close causal relationship' between the environmental effect and the alleged cause" and that "[t]he Court analogized this requirement to the 'familiar doctrine of proximate cause from tort law") (citation omitted); *Food & Water Watch v. FERC*, 28 F.4th 277, 288 (D.C. Cir. 2022) ("Foreseeability depends on information about the 'destination and end use of the gas in question."") (citation omitted); *Sierra Club v. FERC*, 867 F.3d 1357, 1371 (D.C. Cir. 2017) (*Sabal Trail*) ("FERC should have estimated the amount of power-plant carbon emissions that the pipelines will make possible.").

[181] EA at 119.

[182] *Id.*

Case 2:24-cv-00527-NJ   Filed 05/01/24   Page 38 of 78   Document 1-2

emissions from the project (based on the subscribed incremental capacity of 132,000 Dth/d) would result in 2.55 million metric tons of $CO_2e$ per year.[183]

89.     The EA estimates that the social cost of the net GHGs from the project is equal to $388,034,906 (assuming a discount rate of 5%), $1,401,373,389 (assuming a discount rate of 3%), $2,096,862,113 (assuming a discount rate of 2.5%), or $4,231,703,671 (using the 95th percentile of the social cost of GHGs with a discount rate of 3%).[184]  The EA states that "[c]onstruction of Project facilities and downstream end use of natural gas transported by the Project would increase the atmospheric concentration of GHG in combination with past, current, and future emissions from all other sources globally, and would contribute incrementally to future climate change impacts."[185]  We clarify that, assuming that the transported gas is not displacing equal- or higher-emitting sources, we recognize that the projects' contributions to GHG emissions globally contribute incrementally to future climate change impacts,[186] including impacts in the region.[187]

90.     As we have done in prior certificate orders, we compare estimated project GHG emissions to the total GHG emissions of the United States as a whole and at the state level.  This comparison allows us to place a project's anticipated emissions in context.  At a national level, 5,586 million metric tons of $CO_2e$ were emitted in 2021 (inclusive of $CO_2e$ sources and sinks).[188]  Construction emissions from the project could potentially increase $CO_2e$ emissions based on the national 2021 levels by approximately 0.0006%.[189]

---

[183] *Id.* at 119-120.  Full burn calculations are, in most cases, an overestimate because pipelines only operate at full capacity during limited periods of full demand.

[184] *Id.* at 121-122; *see id.* for a description of the method and assumptions staff uses for calculating the social cost of GHGs.  The IWG draft guidance identifies costs in 2020 dollars. Interagency Working Group on Social Cost of Greenhouse Gases, United States Government, *Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide Interim Estimates under Executive Order 13990*, at 5 (Table ES-1) (Feb. 2021).

[185] EA at 119.

[186] *Id.*

[187] *Id.* at 117-118 (discussing observations from the Fourth Assessment Report).

[188] EPA, *Inventory of U.S. Greenhouse Gas Emissions and Sinks*: 1990-2020 at ES-4 (Table ES-2) (April 2022), https://www.epa.gov/system/files/documents/2022-04/us-ghg-inventory-2022-main-text.pdf.

[189] EA at 121.

Operational emission reductions combined with downstream end use emissions could potentially increase $CO_2e$ emissions based on the national 2021 levels by 0.05%.[190]

91.     To provide context on a state level, we compare the project's estimated GHG emissions to the state emission inventories.  The project's construction emissions occur in both Illinois and Wisconsin; operational emission changes would occur only in Wisconsin, and the downstream emissions were allocated to Wisconsin and Illinois based on the service areas of the project shippers.  At a state level, 87.0 million metric tons of carbon dioxide ($CO_2$) were emitted in Wisconsin in 2020, and 169.9 million metric tons of $CO_2$ were emitted in Illinois in 2020 (inclusive of $CO_2$ sources and sinks).[191] Construction emissions from the project in Illinois could potentially increase $CO_2$ emissions based on Illinois's statewide 2020 levels by 0.004%.[192]  Construction emissions from the project in Wisconsin could potentially increase $CO_2$ emissions based on Wisconsin statewide 2020 levels by 0.03%.[193]  In subsequent years, operational emission reductions combined with downstream emissions from the project in Wisconsin could potentially increase $CO_2$ emissions based on Wisconsin statewide 2020 levels by 2.5%.[194]  Downstream emissions from the project in Illinois could potentially increase $CO_2$ emissions based on Illinois statewide 2020 levels by 0.2%.[195]

92.     When states have GHG emissions reduction targets, we will compare the project's GHG emissions to those state goals to provide additional context.  Wisconsin set an executive target in 2019 to reduce GHG emissions 26% to 28% below 2005 levels by 2025.  Statewide $CO_2$ emissions in 2005 were 111 million metric tons.[196]  Operational emission reductions combined with downstream emissions from the project in Wisconsin

---

[190] *Id.*

[191] *Id.* at 120.  *See* U.S. Energy Information Administration, *Table 1, State Energy-Related Carbon Dioxide Emissions by Year, Unadjusted* (July 2023), https://www.eia.gov/environment/emissions/state/.

[192] EA at 120.

[193] *Id.*

[194] *Id.*

[195] *Id.*

[196] We consider the 2025 target to be 81.0 million metric tons (assuming a 27% reduction).

would represent 2.7% of Wisconsin's 2025 GHG emissions level goal.[197]  Illinois set an executive target in 2019 to reduce GHG emissions 26% to 28% below 2005 levels by 2025.  Statewide $CO_2$ emissions in 2005 were 244.4 million metric tons.[198]  Downstream emissions from the project in Illinois would represent 0.2% of Illinois's 2025 GHG emissions level goal.[199]

93.    We clarify that for informational purposes, Commission staff disclosed an estimate of the social cost of GHGs.[200]  While we have recognized in some past orders that social cost of GHGs may have utility in certain contexts such as rulemaking,[201] we have also found that calculating the social cost of GHGs does not enable the Commission to determine credibly whether the reasonably foreseeable GHG emissions associated with a project are significant or not significant in terms of their impact on global climate change.[202]  Currently, there are no criteria to identify what monetized values are significant for NEPA purposes, and we are currently unable to identify any such appropriate criteria.[203]  Nor are we aware of any other currently scientifically accepted

---

[197] EA at 121.

[198] We consider the 2025 target to be 178.4 million metric tons (assuming a 27% reduction).

[199] EA at 121.

[200] *Id.* at 120.  We note that "Commission staff have not identified a methodology to attribute discrete, quantifiable, physical effects on the environment resulting from the Project's incremental contribution to GHGs." *Id.* at 119.

[201] *Fla. Se. Connection, LLC*, 164 FERC ¶ 61,099, at PP 35-37 (2018).

[202] See *Mountain Valley Pipeline, LLC*, 161 FERC ¶ 61,043, at P 296 (2017), *aff'd sub nom.*, *Appalachian Voices v. FERC*, 2019 WL 847199 (D.C. Cir. 2019); *Del. Riverkeeper Network v. FERC*, 45 F.4th 104, 111 (D.C. Cir. 2022).  The social cost of GHGs tool merely converts GHG emissions estimates into a range of dollar-denominated figures; it does not, in itself, provide a mechanism or standard for judging "significance."

[203] *Tenn. Gas Pipeline Co., L.L.C.*, 181 FERC ¶ 61,051, at P 37 (2022); *see also Mountain Valley Pipeline, LLC*, 161 FERC ¶ 61,043 at P 296, *order on reh'g*, 163 FERC ¶ 61,197, at PP 275-297 (2018), *aff'd*, *Appalachian Voices v. FERC*, No. 17-1271, 2019 WL 847199, at *2 (D.C. Cir. Feb. 19, 2019) (unpublished) ("[The Commission] gave several reasons why it believed petitioners' preferred metric, the Social Cost of Carbon tool, is not an appropriate measure of project-level climate change impacts and their significance under NEPA or the Natural Gas Act.  That is all that is required for NEPA purposes."); *EarthReports v. FERC*, 828 F.3d 949, 956 (D.C. Cir. 2016) (accepting the Commission's explanation why the social cost of carbon tool would not be appropriate or

method that would enable the Commission to determine the significance of reasonably foreseeable GHG emissions.[204]  The D.C. Circuit has repeatedly upheld the Commission's decisions not to use the social cost of carbon, including to assess significance.[205]  In fact, the D.C. Circuit recently affirmed the Commission's decision to not analyze the social cost of carbon in its NEPA analysis,[206] rejected the suggestion that it was required to do so, found that the petitioner's arguments "fare no better when framed as NGA challenges," and then, in the very same paragraph, sustained the Commission's public interest determination as "reasonable and lawful."[207]

---

informative for project-specific review, including because "there are no established criteria identifying the monetized values that are to be considered significant for NEPA purposes"); *Tenn. Gas Pipeline Co., L.L.C.*, 180 FERC ¶ 61,205, at P 75 (2022). *See, e.g.*, *LA Storage, LLC*, 182 FERC ¶ 61,026, at P 14 (2023); *Columbia Gulf Transmission, LLC*, 180 FERC ¶ 61,206, at P 91 (2022).

[204] *See, e.g.*, *LA Storage, LLC*, 182 FERC ¶ 61,026 at P 14 ("there are currently no criteria to identify what monetized values are significant for NEPA purposes, and we are currently unable to identify any such appropriate criteria").

[205] *See, e.g.*, *Ctr. for Biological Diversity v. FERC*, 67 F.4th 1176, 1184 (D.C. Cir. 2023) (*Alaska LNG*) (explaining that "the Commission compared the Project's direct emissions with existing Alaskan and nationwide emissions," "declined to apply the social cost of carbon for the same reasons it had given in a previous order"; describing those reasons as:  (1) "the lack of consensus about how to apply the social cost of carbon on a long time horizon," (2) that "the social cost of carbon places a dollar value on carbon emissions but does not measure environmental impacts as such," and (3) "FERC has no established criteria for translating these dollar values into an assessment of environmental impacts"; and recognizing that the Commission's "approach was reasonable and mirrors analysis . . . previously upheld" and that the Commission "had no obligation in this case to consider the social cost of carbon") (citations omitted); *EarthReports*, 828 F.3d at 956 (upholding the Commission's decision not to use the social cost of carbon tool due to a lack of standardized criteria or methodologies, among other things); *Del. Riverkeeper Network v. FERC*, 45 F.4th 104 (also upholding the Commission's decision not to use the social cost of carbon); *Appalachian Voices v. FERC*, 2019 WL 847199 (same).

[206] *Alaska LNG*, 67 F.4th at 1184 ("Rather than use the social cost of carbon, the Commission compared the Project's direct emissions with existing Alaskan and nationwide emissions.  It declined to apply the social cost of carbon for the same reasons it had given in a previous order. . . FERC's approach was reasonable and mirrors analysis we have previously upheld.").

[207] *Id.*

94.    We note that there currently are no accepted tools or methods for the Commission to use to determine significance, and therefore the Commission is not herein characterizing the evaluated GHG emissions as significant or insignificant.[208] Accordingly, we have taken the required "hard look" and have satisfied our obligations under NEPA.

### 9.    Environmental Justice

95.    In conducting NEPA reviews of proposed natural gas projects, the Commission follows Executive Order 12898, which directs federal agencies to identify and address the "disproportionately high and adverse human health or environmental effects" of their actions on minority and low-income populations (i.e., environmental justice communities).[209]    Executive Order 14008 also directs agencies to develop "programs, policies, and activities to address the disproportionately high and adverse human health, environmental, climate-related, and other cumulative impacts on disadvantaged communities, as well as the accompanying economic challenges of such impacts."[210] Environmental justice is "the fair treatment and meaningful involvement of all people

---

[208] The February 18, 2022 *Interim GHG Pol'y Statement, Consideration of Greenhouse Gas Emissions in Nat. Gas Infrastructure Project Revs*., 178 FERC ¶ 61,108 (2022), which proposed to establish a NEPA significance threshold of 100,000 tons per year of CO2e as a matter of policy, has been suspended, and opened to further public comment.  Order on Draft Policy Statements, 178 FERC ¶ 61,197 at P 2.

[209] Exec. Order No. 12,898, 59 Fed. Reg. 7629 (Feb. 16, 1994).  While the Commission is not one of the specified agencies in Executive Order 12898, the Commission nonetheless addresses environmental justice in its analysis, in accordance with our governing regulations and guidance.  *See* C.F.R. § 380.12(g) (2022) (requiring applicants for projects involving significant aboveground facilities to submit information about the socioeconomic impact area of a project for the Commission's consideration during NEPA review); FERC, *Guidance Manual for Environmental Report Preparation* at 4-76 to 4-80 (Feb. 2017), https://www.ferc.gov/sites/default/files/2020-04/guidance-manual-volume-1.pdf.

[210] Exec. Order No. 14,008, 86 Fed. Reg. 7619 (Jan. 27, 2021).  The term "environmental justice community" includes disadvantaged communities that have been historically marginalized and overburdened by pollution.  *Id.* at 7629.  The term also includes, but may not be limited to minority populations, low-income populations, or indigenous peoples.  See EPA, EJ 2020 Glossary (Jul. 31, 2023), https://www.epa.gov/environmentaljustice/ej-2020-glossary.

regardless of race, color, national origin, or income with respect to the development, implementation, and enforcement of environmental laws, regulations, and policies."[211]

96.     Consistent with CEQ[212] and EPA[213] guidance, the Commission's methodology for assessing environmental justice impacts considers: (1) whether environmental justice communities (e.g., minority or low-income populations)[214] exist in the project area; (2) whether impacts on environmental justice communities are disproportionate and adverse; and (3) possible mitigation measures. As recommended in *Promising Practices*, the Commission uses the 50% and the meaningfully greater analysis methods to identify minority populations.[215] Specifically, a minority population is present where either: (1) the aggregate minority population of the block groups in the affected area exceeds 50%;

---

[211] EPA, *Learn About Environmental Justice*, https://www.epa.gov/environmentaljustice/learn-about-environmental-justice (Aug. 16, 2023). Fair treatment means that no group of people should bear a disproportionate share of the negative environmental consequences resulting from industrial, governmental, and commercial operations or policies. *Id.* Meaningful involvement of potentially affected environmental justice community residents means: (1) people have an appropriate opportunity to participate in decisions about a proposed activity that may affect their environment and/or health; (2) the public's contributions can influence the regulatory agency's decision; (3) community concerns will be considered in the decision-making process; and (4) decision makers will seek out and facilitate the involvement of those potentially affected. *Id.*

[212] CEQ, *Environmental Justice: Guidance Under the National Environmental Policy Act* 4 (Dec. 1997) (CEQ's *Environmental Justice Guidance*), https://ceq.doe.gov/docs/ceq-regulations-and-guidance/regs/ej/justice.pdf. CEQ offers recommendations on how federal agencies can provide opportunities for effective community participation in the NEPA process, including identifying potential effects and mitigation measures in consultation with affected communities and improving the accessibility of public meetings, crucial documents, and notices.

[213] *See generally* EPA, *Promising Practices for EJ Methodologies in NEPA Reviews* (Mar. 2016) (*Promising Practices*), https://www.epa.gov/sites/default/-files/2016-08/documents/nepa_promising_practices_document_2016.pdf.

[214] *See generally* Exec. Order No. 12,898, 59 Fed. Reg. 7629 (Feb. 16, 1994). Minority populations are those groups that include: American Indian or Alaskan Native; Asian or Pacific Islander; Black, not of Hispanic origin; or Hispanic.

[215] *See Promising Practices* at 21-25.

Document Accession #: 20231219-3072     Filed Date: 12/19/2023

or (2) the aggregate minority population in the block group affected is 10% higher than the aggregate minority population percentage in the county.[216]

97.     CEQ's *Environmental Justice Guidance* also directs low-income populations to be identified based on the annual statistical poverty thresholds from the U.S. Census Bureau. Using *Promising Practices*' low-income threshold criteria method, low-income populations are identified as block groups where the percent of a low-income population in the identified block group is equal to or greater than that of the county.

98.     To identify potential environmental justice communities during preparation of the EA, Commission staff used 2021 U.S. Census American Community Survey data[217] for the race, ethnicity, and poverty data at the state, county, and block group level.[218] Additionally, in accordance with *Promising Practices*, staff used EJScreen, EPA's environmental justice mapping and screening tool, as an initial step to gather information regarding minority and low-income populations; potential environmental quality issues; environmental and demographic indicators; and other important factors.

99.     Once staff collected the block group level data, as discussed in further detail below, staff conducted an impacts analysis for the identified environmental justice communities and evaluated health or environmental hazards, the natural physical environment, and associated social, economic, and cultural factors to determine whether

---

[216] Here, Commission staff selected the counties as the reference communities to ensure that affected environmental justice communities are properly identified. A reference community may vary according to the characteristics of the particular project and the surrounding communities.

[217] U.S. Census Bureau, American Community Survey 2021 ACS 5-Year Estimates Detailed Tables, File# B17017, *Poverty Status in the Past 12 Months by Household Type by Age of Householder*, https://data.census.gov/cedsci/table?q=B17017; File #B03002 *Hispanic or Latino Origin By Race*, https://data.census.gov/cedsci/table?q=B03002.

[218] For this project, Commission staff determined that the appropriate units of geographic analysis for assessing project impacts on the environmental justice communities was 1) environmental justice block groups crossed by the pipeline and pipe/contractor yards, and 2) environmental justice block groups within a 10-kilometer (6.2-mile) radius of the proposed compressor stations or within a 1-mile radius of the proposed meter stations. These distances are sufficiently broad considering the likely concentration of impacts proximal to the existing and proposed facilities. Additionally, the furthest radius of impact (1-hour nitrogen dioxide [$NO_2$]) during operations for air quality is 3.8 miles for the Kewaskum Compressor Station and 4.1 miles for the Weyauwega Compressor Station. *See* EA at 75.

Document Accession #: 20231219-3072          Filed Date: 12/19/2023

impacts were disproportionately high and adverse on environmental justice communities and also whether those impacts were significant.[219]  Commission staff assessed whether impacts to an environmental justice community were disproportionately high and adverse based on whether those impacts were predominately borne by that community, consistent with EPA's recommendations in *Promising Practices*.[220]  Identified project impacts and proposed mitigation measures are discussed below.

100.    The Commission's environmental staff identified 87 block groups within the geographic scope of analysis, of which 43 census block groups exceeded the defined threshold for minority or low-income communities and are therefore environmental justice communities.[221]

101.    Project work within environmental justice communities includes the Weyauwega Compressor Station, Segment PL-1, Segment PL-2, Segment PL-3 , the Merrill Meter Station, the Stevens Point Meter Station, the Two Rivers Meter Station, and the Oshkosh Meter Station.  The following pipe/contractor yards proposed for use by ANR are located within environmental justice communities:  SA-2005, SA-2006, SA-3001, SA-3002, SA-3004, SA-3005, SA-3006, and SA-3008.  In addition, the following aboveground facilities, while not located within environmental justice communities, are sufficiently close to environmental justice communities such that they were included in the scope of impacts:  the Kewaskum Compressor Station and the South Wausau Meter Station.

102.    The EA's discussion of impacts on the identified environmental justice communities in proximity to the project facilities focuses on socioeconomic, traffic, safety, visual, air, and noise impacts.[222]  The EA does not focus on environmental justice

---

[219] *See Promising Practices* at 33 (stating that "an agency may determine that impacts are disproportionately high and adverse, but not significant within the meaning of NEPA" and in other circumstances "an agency may determine that an impact is both disproportionately high and adverse and significant within the meaning of NEPA").

[220] *Id.* at 44-46 (explaining that there are various approaches to determining whether an action will cause a disproportionately high and adverse impact, and that one recommended approach is to consider whether an impact would be "predominantly borne by minority populations or low-income populations").  We recognize that EPA and CEQ are in the process of updating their guidance regarding environmental justice and we will review and incorporate that anticipated guidance in our future analysis, as appropriate.

[221] EA app. D, tbl. D1.

[222] *Id.* at 14.

concerns for other resource areas due to the minimal overall impact the project would have on those resource areas.

103.    There were multiple opportunities for public involvement during the Commission's prefiling and environmental review processes.[223]  During the pre-filing period, Commission staff worked with ANR and stakeholders to identify and resolve issues, where possible, prior to ANR's filing of a formal application with the Commission.  ANR held four in-person open houses at four different locations along the project route from June 13 to June 16, 2022.  The open houses were publicized by notices in local newspapers and on social media and were attended by over 100 people in total. ANR also provided a virtual open house, available online at https://www.tcenergyopenhouse.com/wrp/.  The virtual open house and other factsheets were translated into Arabic, Hmong, Spanish, and Chinese because ANR identified those languages as languages spoken in limited English-speaking households in environmental justice communities along the project.[224]

104.    In addition to online outreach, ANR states that it distributed information about the project by placing flyers in 12 locations in identified environmental justice communities, including libraries, Goodwill stores, parks, and community centers.  Environmental justice communities were also notified of important project updates such as open houses through targeted social media postings and third-party organizations such as the Fond Du Lac County Chamber of Commerce, Manitowoc County Chamber, Fox River Chamber of Commerce, Oshkosh Chamber of Commerce, economic development groups, and cultural centers that agreed to post and share project information.  ANR also conducted outreach to multiple environmental justice stakeholders.[225]

105.    ANR states that it plans to engage directly with members of the communities along the project, including a back-to-school drive in environmental justice communities, and to highlight its supplier contracting portal specifically in environmental justice

---

[223] *Id.* at 5.

[224] *Id.* at 64.

[225] Environmental justice stakeholders include:  Bethany United Church of Christ, Oshkosh; Faith Baptist Church, Waukesha; First Baptist Church, Waukesha; First Baptist Church, West Bend; Fox Valley Hmong Baptist Church, Appleton; Goodwill Industries of Southeast Wisconsin; Hmong American Association of Portage County; Hmong American Center of Wausau; Hmong American Partnership Fox Valley; Hmong Mutual Assistance Association; Lamb of God Missionary Baptist Church; McHenry County Land Trust; Ozaukee and Washington County Land Trust; Wisconsin Hmong Chamber of Commerce; Wisconsin United Coalition of Mutual Assistance Associations; and Wisconsin United Mutual Assistance Association.

Document Accession #: 20231219-3072    Filed Date: 12/19/2023

communities for women- and minority-owned contractors to provide services such as transportation, catering, and construction.[226]

### a.    Socioeconomic, Traffic, and Safety Impacts

106.    With respect to socioeconomic impacts on environmental justice populations, as described in the EA, the impacts of constructing the project upgrades at the existing aboveground facilities are expected to be temporary and not significant.[227]  The non-local workforce of about 950 workers would be dispersed over a relatively large area and over an 18-month period.  This would result in increased demand for short-term housing but is not expected to have significant impacts on housing availability within environmental justice communities.  The increased demand for short-term public services from non-local construction workers during construction would result in temporary and less than significant impacts.[228]  The non-local workforce would not have an impact on public services and would have a temporary impact on local employment, income, and tax revenues.  ANR estimates that the project would generate over $84 million in federal, state, county, and local tax revenues in the counties traversed by the project.[229]  The EA concludes that, overall, the project would result in beneficial economic effects on the state and local economies by creating a short-term stimulus to the affected areas through payroll expenditures, local purchases of consumables and project- specific materials, and sales tax.[230]

107.    Use of local roads would increase during construction, which would result in a higher volume of traffic, traffic delays, increased commute times, a greater risk of vehicle accidents, and interruption of residential access.[231]  At the Weyauwega Compressor Station, which is within an environmental justice block group, approximately 104 daily round trips are anticipated on average during the proposed construction upgrades at the facility.  About 17 daily round trips would occur on average during the upgrades at the meter stations located in environmental justice block groups (Two Rivers, Steven's Point,

---

[226] EA at 65.

[227] *Id.* at 69.

[228] *Id.*

[229] *Id.*

[230] *Id.*

[231] *Id.* at 69-70.

and Merrill).  These estimates conservatively assume one roundtrip for each worker,[232] and an average of four deliveries per day at compressor stations and two deliveries per day at meter stations.

108.    In its comments on the EA, EPA recommends that the Commission have ANR develop a final Traffic Management Plan that includes measures for routing construction traffic away from homes and schools in order to supply reviewers with an opportunity to review and understand efforts to reduce impacts and residual risk.[233]  ANR commits to file its Traffic Management Plan, which will include measures described in the EA, with the Commission prior to construction.[234]  These measures include continuing to develop haul routes for the project to minimize impacts on neighborhoods, schools, and childcare facilities, and reaching out to affected school districts that cannot be avoided in order to develop a hauling window to limit project traffic overlap with school activities.[235]

109.    EPA also requests that the Commission further discuss whether ANR could relocate any of the eight pipe/contractor yards that are proposed to be located within communities with environmental justice concerns.[236]  We note that relocating yards further away from the project sites and available access points onto local roads could result in additional traffic-related impacts and increase construction costs.  The residential benefit from relocating the yards would be limited given that the yards would still be in the vicinity of remotely populated residences within communities with environmental justice concerns.  The EA describes the temporary impacts on environmental justice communities associated with construction, including use of the proposed pipe/contractor yards.[237]  The EA concludes that project impacts associated with socioeconomic resources (including traffic), visual resources, air quality, and construction noise would be temporary and less than significant.[238]  We agree.

110.    Additionally, EPA recommends that ANR and the Commission commit to developing a fire response and evacuation plan in concert with local fire departments and

---

[232] *Id.* tbl. B.6-3 at 57.

[233] EPA August 21, 2023 Comment at 2.

[234] *Id.* at 62 & 70.

[235] *Id.* at 70.

[236] EPA August 21, 2023 Comment at 2.

[237] EA at 72-74, 76.

[238] *Id.* at 80.

Document Accession #: 20231219-3072          Filed Date: 12/19/2023

law enforcement agencies, given that the project includes areas where residential receptors are less than 1 mile from construction activities, meter stations, and compressor stations.  As described in the EA,[239] on January 15, 1993, the Commission executed a Memorandum of Understanding on Natural Gas Transportation Facilities with the U.S. Department of Transportation.  The Memorandum acknowledges that the U.S. Department of Transportation has the exclusive authority to promulgate federal safety standards used in the transportation of natural gas.  Section 157.14(a)(9)(vi) of the Commission's regulations require that an applicant certify that it would design, install, inspect, test, construct, operate, replace, and maintain the facility for which a certificate is requested in accordance with federal safety standards and plans for maintenance and inspection.[240]  The EA explains that each operator, including ANR, is required to establish an emergency plan that includes procedures to minimize the hazards of a natural gas emergency.[241]  Additionally, the U.S. Department of Transportation requires that each operator establish and maintain liaison with appropriate fire, police, and public officials to learn the resources and responsibilities of each organization that may respond to a natural gas pipeline or facility emergency, and to coordinate mutual assistance.[242]

111.    The EA concludes that, given the scope of the project, the small workforce size compared to the population of the socioeconomic study area, and the mitigation measures proposed by ANR, the project's impacts on socioeconomics would not result in significant adverse effects on environmental justice populations.[243]  We agree.

### b.  <u>Visual Impacts</u>

112.    With respect to visual impacts on environmental justice populations, as described in the EA, impacts on visual and/or aesthetic resources during the construction at the aboveground facilities are expected to be temporary and not significant.[244]  The nearest residential receptor to the Kewaskum Compressor Station is 5.3 miles to the northeast in an environmental justice community.  Several tracts of forested land and rolling terrain separate the residential receptor from the compressor station, and the compressor station is not visible from the receptor.  No non-residential receptors are located within an

---

[239] *Id.* at 105.

[240] 18 C.F.R. § 157.14(a)(9)(vi) (2022).

[241] EA at 106.

[242] *Id.*

[243] *Id.* at 70.

[244] *Id.*

environmental justice community block group within 1 mile of the compressor station. Due to the physical distance and intervening forested land and rolling terrain, the Kewaskum Compressor Station would not be visible from receptors located in the two identified environmental justice communities within the 10-kilometer (6.2-mile) assessment area for the facility.[245]  Additionally, due to the distance to the closest environmental justice community (over 5 miles), the Kewaskum Compressor Station would not be visible to passersby from any roadways in environmental justice communities.  Therefore, the EA concludes that no environmental justice communities within the geographic scope of the Kewaskum Compressor Station would be visually impacted, and thus, impacts would be less than significant.[246]

113.    The nearest residential receptor to the Weyauwega Compressor Station is 1,071 feet to the north in an identified environmental justice community.  A row of trees on the southwest side of the residential tract separates the residential receptor from the compressor station, and the compressor station is not visible from the residence.  The nearest non-residential receptor is 4,470 feet to the southwest.  Several tracts of forested land and rolling terrain separate the non-residential receptor from the compressor station, and the compressor station is not visible from the non-residential receptor.[247]  The Weyauwega Compressor Station is visible to passersby from County Road X.[248]

114.    Construction activities at the Weyauwega Compressor Station would occur within the existing fence line and within about 23.7 acres of temporary workspace adjacent to the compressor station.  Visual impacts associated with the adjacent temporary workspaces would include vegetation and tree disturbance or removal, and the presence of construction vehicles and equipment.  ANR commits to aim construction lighting downward and toward the aboveground facilities to keep the beams within the fence line. Following construction, the size of the Weyauwega Compressor Station would be expanded by 0.8 acre.[249]

115.    During operation of the Weyauwega Compressor Station, ANR would maintain lighting downward and toward the aboveground facilities to keep the beams within the

---

[245] *Id.*

[246] *Id.*

[247] *Id.* at 71.

[248] *Id.*

[249] *Id.*

fence line.[250]  The adjacent construction workspace areas would be restored to preconstruction condition.  The new compressor station equipment and buildings would have an industrial appearance, similar to the existing facilities, and would be of a similar height, ranging from 14 to 53 feet tall.[251]  The EA concludes that visual impacts on environmental justice communities from the work at the Weyauwega Compressor Station would be less than significant.[252]

116.    In order to minimize lighting impacts on environmental justice communities during construction at the aboveground facilities, EPA recommends ANR commit to installing downcast lights adjacent to environmental justice communities during construction.  EPA further recommends surveying members of communities with environmental justice concerns closest to aboveground facilities to see if they would want to have visual barriers become permanent.[253]  The EA provides an assessment of visual impacts on environmental justice communities and associated mitigation.[254]  In addition to mitigating lighting at the Weyauwega Compressor Station, ANR proposes to use downcast lighting during construction pointed backward/toward the workspace at the Wolf River HDD site.[255]  No lighting mitigation would be of use to environmental justice communities near the Kewaskum Compressor Station given that the nearest residential receptor to the Kewaskum Compressor Station is 5.3 miles to the northeast in an environmental justice community.[256]  We find that ANR's proposed light mitigation during construction and operation acceptable, and do not find any reason for ANR to solicit further input from the surrounding communities.

117.    EPA remarks that several compressor stations slated to be upgraded are separated from residences by a line of trees.  EPA states that these residential areas would benefit from properly designed vegetative barriers consisting of evergreen trees planted at certain depth and height specifications, which can also produce air quality benefits, improved aesthetics, increased property values, reduced heat, control of surface water runoff, and

---

[250] ANR application, Resource Report 8 at 8-24.

[251] EA at 71.

[252] *Id.*

[253] EPA August 21, 2023 Comments at 2.

[254] EA at 70-74.

[255] *Id.* at 71-72; ANR February 9, 2023 Reply to Commission Staff Environmental Information Request at 1.

[256] EA at 70.

reduced noise pollution.[257]  We note that ANR only proposes work at two compressor stations.  As described above, rolling terrain and forest would effectively shield any close-by residences of environmental justice communities from views of the Kewaskum Compressor Station, and the proposed modifications to the Weyauwega Compressor Station would be consistent with the compressor station's existing visual character.  The EA states that the construction activities would be temporary and short-term, and concludes that visual impacts on environmental justice communities from modifications at the compressor stations would be less than significant.[258]

118.    The proposed modifications at the five existing meter stations would generally consist of replacing piping and would be conducted within the existing stations.  The nearest residence to the Oshkosh Meter Station is 194 feet to the south in an environmental justice community.[259]  Forested land on the north side of the residential tract separates the residential receptor from the meter station, and the meter station is not visible from the residence.  The nearest non-residential receptor is 1,108 feet to the southeast in an environmental justice community.  Forested land on the north side of the non-residential tract separates the non-residential receptor from the meter station, and the meter station is not visible from the receptor.[260]

119.    The nearest residence to the Merrill Meter Station is 431 feet to the south in an environmental justice community.[261]  Forested land on the northeast side of the residential tract separates the residence from the meter station, and the meter station is not visible from the residence.  The nearest non-residential receptor is 651 feet to the northwest in an environmental justice community.  Forested land on the south side of the non-residential tract separates the non-residential receptor from the meter station, and the meter station is not visible from the receptor.[262]

120.    The nearest residence to the South Wausau Meter Station is 1,913 feet to the southwest in an environmental justice community.[263]  Forested land on the north side of

---

[257] EPA August 21, 2023 Comments at 2-3.

[258] EA at 72.

[259] *Id.* at 71.

[260] *Id.*

[261] *Id.*

[262] *Id.*

[263] *Id.*

Document Accession #: 20231219-3072          Filed Date: 12/19/2023

the residential tract and a building on the northeast side of the residential tract separate the residence from the meter station, and the meter station is not visible from the residence. No non-residential receptor is located in an environmental justice community block group within 1 mile of the meter station.[264]

121. The nearest residence to the Stevens Point Meter Station is 1,413 feet to the southeast in an environmental justice community.[265] Several tracts of forested land and rolling terrain separate the residence from the meter station, and the meter station is not visible from the residence. No non-residential receptors are located within 1 mile of the meter station.[266]

122. The nearest residence to the Two Rivers Meter Station is 1,735 feet to the southeast in an environmental justice community.[267] Buildings to the northwest of the residence separate it from the meter station, and the meter station is not visible from the residence. The meter station is visible to the nearest non-residential receptor, which is 312 feet to the south in an environmental justice community; however, the proposed meter station changes would not be visually prominent to this non-residential receptor at this distance.[268]

123. The EA states that the proposed modifications at the existing meter stations would be consistent with the existing visual character of the facilities, and construction activities would be temporary and short-term; the EA therefore concludes that the visual impacts on environmental justice communities from modifications at the meter stations would be less than significant.[269]

124. ANR proposes to install the majority of the proposed pipeline replacement facilities within the same trench as, or adjacent to but offset from, the existing pipeline. Therefore, the right-of-way for the replacement pipeline would be similar visually to current conditions, except the cleared corridor would be wider until trees and vegetation have had a chance to reestablish.[270] The Wolf River and Jenny Bayou HDD entry and

---

[264] *Id.* at 72.

[265] *Id.*

[266] *Id.*

[267] *Id.*

[268] *Id.*

[269] *Id.*

[270] *Id.*

exit points are within one mile of an environmental justice community.[271]  Nighttime operation of the HDD would require construction lighting, which could result in visual impacts to the environmental justice community.[272]  As stated in the EA, ANR commits to mitigation measures, including downcast lighting pointed away from nearby residences, minimizing nighttime activities, and noise barriers at the HDD site, that would help block nearby residences from the effects of construction lighting.[273]  The EA states that visual impacts on environmental justice communities from the proposed pipeline facilities would be less than significant, and that no project aboveground facilities would be visible from sensitive receptors within 1 mile of environmental justice communities.[274]

125.    The pipe/contractor yards in environmental justice communities would result in temporary visual impacts during construction.  Once the pipe/contractor yards have been returned to preconstruction site conditions, they would be difficult to distinguish from their prior appearance, and no long-term impacts are anticipated for environmental justice communities.  Visual impacts would be greatest where the pipe/contractor yards parallel roads where they may be seen by passing motorists.[275]

126.    The nearest residence to Pipe/Contractor Yard SA-2005 is about 150 feet to the northwest within a community with environmental justice concerns.[276]  Vegetation would provide screening from the yard, which is currently an agricultural field.  An existing storage facility would block the view of the proposed yard from residences to the west and across the street.  The nearest non-residential receptor is 30 feet to the south in an environmental justice community.  This yard would be fully visible to the non-residential receptor with no obstructions and would differ from the existing viewshed.[277]

---

[271] *Id.*

[272] *Id.*

[273] *Id.*

[274] *Id.*

[275] *Id.* at 72-73.

[276] *Id.* at 73.

[277] *Id.*

Document Accession #: 20231219-3072     Filed Date: 12/19/2023

127.    The nearest residence to Pipe/Contractor Yard SA-2006 is 80 feet to the east in an environmental justice community.[278]  A dense tree line separates the residence and the yard, and visibility would be minimal.  The viewshed would not greatly differ from existing use.  The nearest non-residential receptor is 600 feet to the west in an environmental justice community.  Rolling terrain and a tree line would separate the receptor from the contractor yard, and it would not be visible.[279]

128.    The nearest residence to Pipe/Contractor Yard SA-3001 is 800 feet to the northeast in an environmental justice community.[280]  It would not be visible from the residence because multiple tree lines separate the receptor from the contractor yard.  The nearest non-residential receptor is 120 feet to the east in an environmental justice community.  The contractor yard would be partially visible from the receptor, with a developed tree line separating the receptor from the contractor yard.  The contractor yard would differ from the existing site viewshed, which is agricultural; however, the contractor yard would not be visually prominent to this non-residential receptor due to the presence of trees.[281]

129.    The nearest residence to Pipe/Contractor Yard SA-3002 is 100 feet to the north in an environmental justice community.[282]  The contractor yard would be fully visible from the residence with no obstructions.  The contractor yard would differ from the existing site viewshed, which is agricultural.  The nearest non-residential receptor is 410 feet to the west in an environmental justice community.  The yard would be fully visible with no obstructions.[283]

130.    The nearest residence to Pipe/Contractor Yard SA-3004 is 845 feet to the north in an environmental justice community.[284]  The yard would be fully visible with no obstructions.  The contractor yard would differ from the existing site viewshed, which is agricultural.  The nearest non-residential receptor is 320 feet to the south in an environmental justice community.  The contractor yard would not be visible from the

---

[278] *Id.*

[279] *Id.*

[280] *Id.*

[281] *Id.*

[282] *Id.*

[283] *Id.*

[284] *Id.*

receptor because a heavily wooded area would separate the receptor from the contractor yard.[285]

131.    The nearest residence to Pipe/Contractor Yard SA-3005 is 50 feet to the east in an environmental justice community.[286]  The yard would be partially visible from the residence, with a developed tree line separating the residence from the contractor yard. The contractor yard would differ from the existing site viewshed, which is agricultural. The nearest non-residential receptor is 740 feet to the west in an environmental justice community.  The contractor yard would be fully visible from this receptor with no obstructions.  The contractor yard would differ from the existing site viewshed, which is agricultural.[287]  However, the contractor yard would not be visually prominent to this non-residential receptor at this distance.

132.    The nearest residence to Pipe/Contractor Yard SA-3006 is 900 feet to the north in an environmental justice community.[288]  The yard would be partially visible from the residence, with a developed tree line separating the residence from the contractor yard. The contractor yard would differ from the existing site viewshed, which is agricultural. The nearest non-residential receptor is 510 feet to the southwest in an environmental justice community.  The contractor yard would not be visible from this receptor because a heavily wooded area would separate the receptor from the contractor yard.[289]

133.    The nearest residence to Pipe/Contractor Yard SA-3008 is 1,120 feet to the north in an environmental justice community.[290]  The yard would be fully visible from this location with no obstructions.  The contractor yard would differ from the existing site viewshed, which is agricultural, but would not be visually prominent due to the distance. The nearest non-residential receptor is 320 feet to the south in an environmental justice community.  It would not be visible from the receptor because a heavily wooded area would separate the receptor from the contractor yard.[291]

---

[285] *Id.*

[286] *Id.*

[287] *Id.* at 74.

[288] *Id.*

[289] *Id.*

[290] *Id.*

[291] *Id.*

Document Accession #: 20231219-3072    Filed Date: 12/19/2023

134.    The EA states that visual impacts on environmental justice communities from the proposed pipe/contractor yards facilities would occur but would be less than significant. Thus, the EA concludes visual impacts on environmental justice communities would be less than significant.[292]

135.    Based on the foregoing, we agree with the analysis in the EA and conclude that the project's overall visual impacts on environmental justice communities would be less than significant.

### c.    Air Quality

136.    The Weyauwega Compressor Station and the Kewaskum Compressor Station are inside environmental justice communities in portions of Waupaca County and Sheboygan County, respectively, which are listed as attainment/unclassified for all criteria pollutants.[293]  The Merrill Meter Station, Oshkosh Meter Station, Stevens Point Meter Station, and Two Rivers Meter Station are located in environmental justice communities that are within attainment areas.[294]  Some construction activities would take place in McHenry County, Illinois, and Waukesha and Washington Counties, Wisconsin, which are designated as nonattainment for the 8-hour ozone National Ambient Air Quality Standards (NAAQS).[295]

137.    The EA states that the project would result in air quality impacts associated with construction, including emissions from fossil-fueled construction equipment and fugitive dust.[296]  Construction at all of the project's proposed pipeline and aboveground facility sites would contribute to air quality impacts from vegetation clearing, land preparation, grading, trenching, HDD drilling, and installation activities for a 12- to 18-month duration.[297]  ANR would implement several mitigation measures during construction to minimize construction air impacts.  These measures include:  1) limiting the areas of ground disturbance and implementing measures to control construction-related emissions and fugitive dust in compliance with state regulations and Commission requirements, 2) limiting construction to daytime hours where possible, maintaining construction

---

[292] *Id.*

[293] *Id.*

[294] *Id.*

[295] *Id.*

[296] *Id.*

[297] *Id.*

equipment in good working order, and using mufflers for equipment exhaust to reduce construction noise, and 3) using its Fugitive Dust Control Plan.[298]  The EA concludes that given these measures and the temporary nature of construction, the construction emissions associated with the project would not significantly affect local or regional air quality.[299]

138.    As discussed in the EA, operation of the project would result in some beneficial impacts on air quality as compared to pre-project conditions.[300]  ANR would operate the hybrid units proposed at the Kewaskum and Weyauwega Compressor Stations as electric drives under normal operating conditions, during which time they would not produce emissions.[301]  Emissions of nitrogen oxide (NOx) at the existing Kewaskum Compressor Station now exceed the 250 tons per year (tpy) Prevention of Significant Deterioration (PSD) threshold, and the station is classified as a major stationary source of NOx under the PSD program.[302]  The project modifications to remove the existing compressor turbine and engines would reduce NOx emissions below the PSD threshold at the Kewaskum Compressor Station.[303]  Emissions of NOx and carbon monoxide (CO) from the Kewaskum Compressor Station currently exceed the 100 tpy Title V threshold for criteria pollutants.[304]  Following project construction, emissions from the Kewaskum Compressor Station would be below all Title V applicability thresholds and would continue to be below the NAAQS.[305]

139.    The Weyauwega Compressor Station is an existing minor stationary source under the PSD program because potential emissions of the regulated air pollutants from the station are less than the 250 tpy PSD threshold.[306]  Removal of the older natural gas-fired reciprocating units at the Weyauwega Compressor Station would result in a reduction in

---

[298] *Id.* at 89.

[299] *Id.* at 75.

[300] *Id.* at 86-97.

[301] *Id.* at 75.

[302] *Id.*

[303] *Id.*

[304] *Id.*

[305] *Id.*

[306] *Id.*

Document Accession #: 20231219-3072    Filed Date: 12/19/2023

permitted emissions.[307]  Following project construction, the Weyauwega Compressor Station would remain a minor source with respect to PSD, and the Weyauwega Compressor Station would not cause or contribute to an exceedance of the NAAQS because the results for all pollutants and averaging periods are below the NAAQS.[308]

140.    The EA states that, while the upgraded meter stations would have minor emissions due to leaks (i.e., fugitive emissions), the project's meter stations would not adversely affect air quality in the project area.[309]

141.    The EA concludes that, overall, the construction and operational emissions from the project would not have significant adverse air quality impacts on the environmental justice populations in the project area.[310]  We agree.

### d.    <u>Noise</u>

142.    Noise would be generated during construction of the pipeline replacements and the aboveground facility modifications.[311]  Construction-related noise impacts could potentially occur at residences in the area of pipeline construction.  Additionally, noise would be generated at the proposed pipe/contractor yards.  One NSA near the Wolf Creek HDD is within an environmental justice community.

143.    Noise levels above ambient conditions attributable to project construction activities would vary over time and would depend on the nature of the construction activity, the number and type of equipment operating, and the distance between sources and NSAs.[312]  These impacts would be limited primarily to daytime hours of 7:00 a.m. to 7:00 p.m., Monday through Saturday.[313]  The EA discusses a number of noise reduction

---

[307] *Id.*

[308] *Id.*

[309] *Id.*

[310] *Id.*

[311] *Id.* at 76.

[312] *Id.*

[313] *Id.*

Document Accession #: 20231219-3072     Filed Date: 12/19/2023

mitigation strategies involving pipeline construction equipment that ANR proposes to implement.[314]

144.    In order to minimize noise impacts to environmental justice communities, EPA recommends ANR commit to installing Sound Transmission Class (STC) 43 SK8 acoustical barrier panels during construction.[315]  EPA further recommends surveying members of communities with environmental justice concerns closest to the aboveground facilities to see if they would want to have the noise barriers become permanent.[316]  The EA describes mitigation measures to minimize construction noise impacts resulting from ANR's proposed Wolf River HDD operations for residences within the environmental justice community.[317]  These measures include using acoustical noise panels (including STC 43 SK8 panels on the north and northwest side of the entry site), minimizing nighttime activities, and compensation for temporary relocation of those impacted.[318]  The EA states that with ANR's use of its proposed acoustical barrier panels, predicted construction noise levels at the NSA within an environmental justice community near the Wolf River HDD would be below 55 Ldn, dBA.[319]  Additionally, as noted above, this order includes Environmental Condition 18, which includes requirements for noise monitoring during HDD nighttime construction activities.

145.    EPA recommends that the Commission consider requiring temporary relocations for environmental justice residents within one mile of construction activities, particularly if high-noise activities will be conducted during nighttime hours, weekends, or holidays.[320]  ANR has stated that it will provide relocation compensation for those residences near the HDD site that are impacted.[321]  Given the relatively large distances that most residential receptors are located from the project, the noise mitigation measures

---

[314] *Id.* at 100.

[315] EPA August 21, 2023 Comments at 2.

[316] *Id.*

[317] EA at 100.

[318] *Id.* at 72 & 100; ANR February 9, 2023 Reply to Commission Staff Environmental Information Request at 39.

[319] *Id.* at 76.

[320] EPA August 21, 2023 Comments at 2.

[321] ANR February 9, 2023 Reply to Commission Staff Environmental Information Request at 39.

Document Accession #: 20231219-3072          Filed Date: 12/19/2023

mentioned above and the temporary nature of construction, we conclude that noise impacts do not rise to a level warranting any further temporary relocations.

146.    Based on the low projected noise levels and construction noise mitigation measures ANR would employ, the EA concludes that the project would not result in significant construction noise impacts on local residents within the surrounding environmental justice populations.[322]  We agree.

147.    The EA lists the distances to the closest NSAs within environmental justice communities and the predicted operational sound levels for the Weyauwega Compressor Station.[323]  The predicted sound levels from operation of the Weyauwega Compressor Station, given the implementation of proposed mitigation measures in the facility design, are estimated to be lower than the Ldn of 55 dBA at the NSAs in the nearby environmental justice communities.  Therefore, no significant adverse noise impacts are anticipated to occur in the identified environmental justice communities located within 5 kilometers (3.1 miles) of the Weyauwega Compressor Station.[324]

148.    The EA states there are no NSAs within, and therefore no adverse noise impacts upon, environmental justice communities within 5 kilometers (3.1 miles) of the Kewaskum Compressor Station.[325]

149.    The EA also states that the potential increase in sound levels for the NSAs near the modified Two Rivers Meter Station, Stevens Point Meter Station, South Wausau Meter Station, Merrill Meter Station, and Oshkosh Meter Station would be below the Commission noise level standard of 55 dBA Ldn with no noticeable increase in noise from the project modifications.[326]

150.    In order to reduce operation-related impacts from noise on environmental justice communities, ANR included noise reduction measures in the design of the project, including high performance acoustically designed compressor buildings; high performance engine exhaust and air inlet systems; low noise lube oil coolers, water coolers, and gas coolers; burying high pressure gas piping below ground; low noise

---

[322] EA at 76.

[323] *Id.* at 77.

[324] *Id.* at 76.

[325] *Id.* at 77.

[326] *Id.*

control valves; and unit blowdown silencers.[327]  Based on the projected noise levels and the mitigation measures, the EA concludes the project would not result in significant operational noise impacts on local residents and the surrounding environmental justice community.[328]  We agree.

### e.    Environmental Justice Conclusion

151.    As described in the EA, the project would have a range of impacts on the environment and on individuals living in the vicinity of the project facilities, including environmental justice populations.[329]  Of 87 block groups within the geographic scope of analysis, 43 are considered environmental justice populations.  Project work within the identified environmental justice communities includes the modifications to the Weyauwega Compressor Station, Segment PL-1, Segment PL-2, Segment PL-3, Merrill Meter Station, Stevens Point Meter Station, Two Rivers Meter Station, Oshkosh Meter Station, and eight pipe/contractor yards.  In addition, there are environmental justice communities within a 10-km radius of the Kewaskum Compressor Station and within a 1-mile radius of the South Wausau Meter Station.

152.    Temporary and permanent impacts associated with these facilities on environmental justice communities would be disproportionately high and adverse as they would be predominately borne by environmental justice communities.[330]  Project impacts related to construction activities would be associated with socioeconomics, transportation, safety, visual, air quality, and noise, and would be temporary and less than significant.[331]  Project impacts causing  permanent impacts on environmental justice communities would be associated with visual resources, noise, and air quality from operation of the compressor station upgrades, and would also be less than significant.[332]

### E.    Environmental Analysis Conclusion

153.    We have reviewed the information and analysis contained in the EA, as well as the other information in the record, regarding potential environmental effects of the project. We accept the environmental recommendations in the EA, as modified above, and we are

---

[327] *Id.* at 78.

[328] *Id.* at 77-78.

[329] *Id.* at 80.

[330] *Id.*

[331] *Id.*

[332] *Id.*

including them as conditions in the appendix to this order. Based on the analysis in the EA, as supplemented or clarified herein, we conclude that if abandoned, constructed, and operated in accordance with the ANR's application and supplements, and in compliance with the environmental conditions in the appendix to this order, our approval of this proposal would not constitute a major federal action significantly affecting the quality of the human environment.[333] We note that the analysis in the EA provides substantial evidence for our conclusions in this order, but that it is the order itself that serves as the record of decision, consistent with the Commission's obligations under NEPA and the Administrative Procedure Act. For that reason, to the extent that any of the analysis in the EA is inconsistent with or modified by the Commission's analysis and findings in the order, it is the order that controls and we do not rely on or adopt on any contrary analysis in the EA.

## IV.    <u>Conclusion</u>

154.    We find that ANR has demonstrated a need for the Wisconsin Reliability Project, which will enable it to upgrade existing pipeline and compression facilities with new, more modern pipeline and compression facilities and provide 132,000 Dth/d of incremental transportation service on its pipeline system. Further, the project will not have adverse impacts on ANR's existing shippers or on other pipelines and their existing customers and will have minimal impacts on the interests of landowners and surrounding communities. Based on the discussion above, we find under section 7 of the NGA that the public convenience and necessity requires approval of the project, subject to the conditions in this order.

155.    Compliance with the environmental conditions appended to our orders is integral to ensuring that the environmental impacts of approved projects are consistent with those anticipated by our environmental analyses. Thus, Commission staff carefully reviews all information submitted. Only when satisfied that ANR has complied with all applicable conditions would a notice to proceed with the activity to which the conditions are relevant be issued. We also note that the Commission has the authority to take whatever steps are necessary to ensure the protection of environmental resources during abandonment, construction, and operation of the project, including authority to impose any additional measures deemed necessary to ensure continued compliance with the intent of the conditions of the order, as well as the avoidance or mitigation of unforeseen adverse environmental impacts resulting from Project abandonment, construction, and operation.

156.    Any state or local permits issued with respect to the jurisdictional facilities authorized herein must be consistent with the conditions of this certificate. The

---

[333] We are not making a significance determination regarding GHG impacts for the reasons discussed in PP 93-94, *supra.*

Document Accession #: 20231219-3072    Filed Date: 12/19/2023

Commission encourages cooperation between interstate pipelines and local authorities. However, this does not mean that state and local agencies, through application of state or local laws, may prohibit or unreasonably delay the construction or operation of facilities approved by this Commission.[334]

157.    The Commission on its own motion received and made a part of the record in this proceeding all evidence, including the applications, and exhibits thereto, and all comments, and upon consideration of the record,

The Commission orders:

(A)    A certificate of public convenience and necessity is issued to ANR, authorizing it to construct and operate the proposed Wisconsin Reliability Project, as described and conditioned herein, and as more fully described in the application and subsequent filings, including any commitments made therein.

(B)    The certificate issued in Ordering Paragraph (A) is conditioned on ANR's:

(1)    completion of construction of the proposed facilities and making them available for service within two years of the date of this order pursuant to section 157.20(b) of the Commission's regulations;

(2)    compliance with all applicable Commission regulations under the NGA including, but not limited to, Parts 154, 157, and 284, and paragraphs (a), (c), (e), and (f) of section 157.20 of the Commission's regulations; and

(3)    compliance with the environmental conditions listed in the appendix to this order.

(C)    ANR shall file a written statement affirming that it has executed firm contracts for the capacity levels and terms of service represented in its filed precedent agreements, prior to commencing construction.

---

[334] *See* 15 U.S.C. § 717r(d) (state or federal agency's failure to act on a permit considered to be inconsistent with Federal law); *see also Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 310 (1988) (state regulation that interferes with FERC's regulatory authority over the transportation of natural gas is preempted) and *Dominion Transmission, Inc. v. Summers,* 723 F.3d 238, 245 (D.C. Cir. 2013) (noting that state and local regulation is preempted by the NGA to the extent it conflicts with federal regulation, or would delay the construction and operation of facilities approved by the Commission).

Document Accession #: 20231219-3072          Filed Date: 12/19/2023

(D)      ANR is granted permission and approval to abandon the facilities described in this order, and as more fully described in the application.

(E)      ANR shall notify the Commission within 10 days of the abandonment of the facilities.

(F)      ANR is required to use the incremental charges as reflected on page 2 of Exhibit N of its May 31, 2023 data response as the initial recourse charges for the expansion portion of the Project under Rate Schedules FT-3 and ETS of its tariff.

(G)      ANR's proposal to charge its currently effective system Transporters Use percentage and an incremental EPC Charge for the expansion portion of the Project is approved.

(H)      A predetermination is granted for ANR to roll the costs of the Replacement Facilities pertaining to segments PL-1, PL-2, PL-3, associated compression, and auxiliary facilities into its system rates in a future NGA section 4 rate case, absent a significant change in circumstances.

(I)      ANR shall notify the Commission's environmental staff by telephone or e-mail of any environmental noncompliance identified by itself or by federal, state, or local agencies on the same day that such agency notifies ANR. ANR shall file written confirmation of such notification with the Secretary of the Commission within 24 hours.

By the Commission. Commissioner Danly is not participating.
                          Commissioner Clements is dissenting in part with a separate
                          statement attached.


( S E A L )




                                                    Debbie-Anne A. Reese,
                                                    Deputy Secretary.

Case 2:24-cv-00527-NJ   Filed 05/01/24   Page 66 of 78   Document 1-2

Document Accession #: 20231219-3072     Filed Date: 12/19/2023

## Appendix - Environmental Conditions

As recommended in the Environmental Assessment (EA), and otherwise amended herein, this authorization includes the following conditions:

1.  ANR Pipeline Company (ANR) shall follow the construction procedures and mitigation measures described in its application and supplements (including responses to staff data requests, excluding the Illinois Agricultural Impact Mitigation Agreement [IAIMA] or Wisconsin Agricultural Mitigation Plan [WAMP]) and as identified in the EA, unless modified by the Order.  ANR must:
    a.  request any modification to these procedures, measures, or conditions in a filing with the Secretary of the Commission (Secretary);
    b.  justify each modification relative to site-specific conditions;
    c.  explain how that modification provides an equal or greater level of environmental protection than the original measure; and
    d.  receive approval in writing from the Director of the Office of Energy Project (Director of OEP), or the Director's designee, **before using that modification**.

2.  The Director of OEP, or the Director's designee, has delegated authority to address any requests for approvals or authorizations necessary to carry out the conditions of the Order, and take whatever steps are necessary to ensure the protection of environmental resources during construction and operation of the Project.  This authority shall allow:
    a.  the modification of conditions of the Order;
    b.  stop-work authority; and
    c.  the imposition of any additional measures deemed necessary to ensure continued compliance with the intent of the conditions of the Order as well as the avoidance or mitigation of unforeseen adverse environmental impact resulting from Project construction and operation.

3.  **Prior to any construction**, ANR shall file an affirmative statement with the Secretary, certified by a senior company official, that all company personnel, Environmental Inspector's (EI), and contractor personnel would be informed of the EI's authority and have been or would be trained on the implementation of the environmental mitigation measures appropriate to their jobs **before** becoming involved with construction and restoration activities.

4.  The authorized facility locations shall be as shown in the EA, as supplemented by filed alignment sheets, and shall include the staff's recommended facility locations identified on pages 131 and 132 of the EA (e.g., route variation PL-2-B and abandonment by removal on PL-3 between

Mileposts 86.6 and 87.2). **As soon as they are available, and before the start of construction**, ANR shall file with the Secretary any revised detailed survey alignment maps/sheets at a scale not smaller than 1:6,000 with station positions for all facilities approved by the Order. All requests for modifications of environmental conditions of the Order or site-specific clearances must be written and must reference locations designated on these alignment maps/sheets.

ANR's exercise of eminent domain authority granted under Natural Gas Act (NGA) section 7(h) in any condemnation proceedings related to the Order must be consistent with these authorized facilities and locations. ANR's right of eminent domain granted under NGA section 7(h) does not authorize it to increase the size of its natural gas facilities to accommodate future needs or to acquire a right-of-way for a pipeline to transport a commodity other than natural gas.

5.  ANR shall file with the Secretary detailed alignment maps/sheets and aerial photographs at a scale not smaller than 1:6,000 identifying all route realignments or facility relocations, and staging areas, pipe storage yards, new access roads, and other areas that would be used or disturbed and have not been previously identified in filings with the Secretary. Approval for each of these areas must be explicitly requested in writing. For each area, the request must include a description of the existing land use/cover type, documentation of landowner approval, whether any cultural resources or federally listed threatened or endangered species would be affected, and whether any other environmentally sensitive areas are within or abutting the area. All areas shall be clearly identified on the maps/sheets/aerial photographs. Each area must be approved in writing by the Director of OEP, or the Director's designee, **before construction in or near that area**.

This requirement does not apply to extra workspace allowed by the Commission's *Upland Erosion Control, Revegetation, and Maintenance Plan* and/or minor field realignments per landowner needs and requirements which do not affect other landowners or sensitive environmental areas such as wetlands.

Examples of alterations requiring approval include all route realignments and facility location changes resulting from:
a.   implementation of cultural resources mitigation measures;
b.   implementation of endangered, threatened, or special concern species mitigation measures;
c.   recommendations by state regulatory authorities; and
d.   agreements with individual landowners that affect other landowners or could affect sensitive environmental areas.

6.  **Within 60 days of the acceptance of the authorization and before construction begins**, ANR shall file an Implementation Plan with the Secretary for review and written approval by the Director of OEP, or the Director's designee.  ANR must file revisions to the plan as schedules change.  The plan shall identify:

    a.  how ANR would implement the construction procedures and mitigation measures described in its application and supplements (including responses to staff data requests, excluding the IAIMA or WAMP), identified in the EA, and required by the Order;

    b.  how ANR would incorporate these requirements into the contract bid documents, construction contracts (especially penalty clauses and specifications), and construction drawings so that the mitigation required at each site is clear to on- site construction and inspection personnel;

    c.  the number of EIs assigned, and how the company would ensure that sufficient personnel are available to implement the environmental mitigation;

    d.  company personnel, including EIs and contractors, who would receive copies of the appropriate material;

    e.  the location and dates of the environmental compliance training and instructions ANR would give to all personnel involved with construction and restoration (initial and refresher training as the Project progresses and personnel change), with the opportunity for OEP staff to participate in the training session(s);

    f.  the company personnel (if known) and specific portion of ANR's organization having responsibility for compliance;

    g.  the procedures (including use of contract penalties) ANR would follow if noncompliance occurs; and

    h.  for each discrete facility, a Gantt or PERT chart (or similar project scheduling diagram), and dates for:

        i.    the completion of all required surveys and reports;
        ii.   the environmental compliance training of on-site personnel;
        iii.  the start of construction; and
        iv.   the start and completion of restoration.

7.  ANR shall employ at least one EI per construction spread.  The EIs shall be:

    a.  responsible for monitoring and ensuring compliance with all mitigation measures required by the Order and other grants, permits, certificates, or other authorizing documents;

    b.  responsible for evaluating the construction contractor's implementation of the environmental mitigation measures required in the contract (see condition 6 above) and any other authorizing document;

     c.     empowered to order correction of acts that violate the environmental conditions of the Order, and any other authorizing document;

     d.     a full-time position, separate from all other activity inspectors;

     e.     responsible for documenting compliance with the environmental conditions of the Order, as well as any environmental conditions/permit requirements imposed by other federal, state, or local agencies; and

     f.     responsible for maintaining status reports.

8.     Beginning with the filing of its Implementation Plan, ANR shall file updated status reports with the Secretary on a **biweekly** basis until all construction and restoration activities are complete. On request, these status reports would also be provided to other federal and state agencies with permitting responsibilities. Status reports shall include:

     a.     an update on ANR's efforts to obtain the necessary federal authorizations;

     b.     the construction status of the Project, work planned for the following reporting period, and any schedule changes for stream crossings or work in other environmentally sensitive areas;

     c.     a listing of all problems encountered and each instance of noncompliance observed by the EI during the reporting period (both for the conditions imposed by the Commission and any environmental conditions/permit requirements imposed by other federal, state, or local agencies);

     d.     a description of the corrective actions implemented in response to all instances of noncompliance;

     e.     the effectiveness of all corrective actions implemented;

     f.     a description of any landowner/resident complaints which may relate to compliance with the requirements of the Order, and the measures taken to satisfy their concerns (see condition 9 below); and

     g.     copies of any correspondence received by ANR from other federal, state, or local permitting agencies concerning instances of noncompliance, and ANR's response.

9.     ANR shall develop and implement an environmental complaint resolution procedure, and file such procedure with the Secretary, for review and approval by the Director of OEP, or the Director's designee. The procedure shall provide landowners with clear and simple directions for identifying and resolving their environmental mitigation problems/concerns during construction of the Project and restoration of the right-of-way. **Prior to construction**, ANR shall mail the complaint procedures to each landowner whose property will be crossed by the project.

Document Accession #: 20231219-3072     Filed Date: 12/19/2023

    a.      In its letter to affected landowners, ANR shall:

        i.      provide a local contact that the landowners should call first with their concerns; the letter should indicate how soon a landowner should expect a response;

        ii.     instruct the landowners that if they are not satisfied with the response, they should call ANR's Hotline; the letter should indicate how soon to expect a response; and

        iii.    instruct the landowners that if they are still not satisfied with the response from ANR's Hotline, they should contact the Commission's Landowner Helpline at 877-337-2237 or at [LandownerHelp@ferc.gov](mailto:LandownerHelp@ferc.gov).

    b.      In addition, ANR shall include in its **biweekly** status report a copy of a table that contains the following information for each problem/concern:

        i.      the identity of the caller and date of the call;

        ii.     the location by milepost and identification number from the authorized alignment sheet(s) of the affected property;

        iii.    a description of the problem/concern; and

        iv.    an explanation of how and when the problem was resolved, will be resolved, or why it has not been resolved.

10.    ANR must receive written authorization from the Director of OEP, or the Director's designee, **before commencing construction or abandonment activities of any Project facilities**.  To obtain such authorization, ANR must file with the Secretary documentation that it has received all applicable authorizations required under federal law (or evidence of waiver thereof).

11.    ANR must receive written authorization from the Director of OEP, or the Director's designee, **before placing the Project into service**.  Such authorization would only be granted following a determination that rehabilitation and restoration of the right-of-way and other areas affected by the Project are proceeding satisfactorily.

12.    **Within 30 days of placing the authorized facilities in service**, ANR shall file an affirmative statement with the Secretary, certified by a senior company official:

    a.      that the facilities have been constructed in compliance with all applicable conditions, and that continuing activities would be consistent with all applicable conditions; or

    b.      identifying which of the conditions in the Order ANR has complied with or would comply with.  This statement shall also identify any areas affected by the Project where compliance measures were not

properly implemented, if not previously identified in filed status reports, and the reason for noncompliance.

13. **Prior to construction activities at horizontal directional drill (HDD) areas between Milepost 70.8 and Milepost 72.0**, ANR shall file with the Secretary, for review and written approval by the Director of OEP, or the Director's designee, the following information for the Wolf River and Jenny Bayou HDDs:

    a. copies of all geotechnical investigation results including boring locations, lithologic descriptions, results of standard penetration tests, and bedrock quality designations; and

    b. an HDD assessment that includes a description of:

        i. any subsurface conditions that were identified as a result of geotechnical investigations that may increase the risk of HDD complications (e.g., unplanned inadvertent returns, drill hole collapse, contamination) either by quantifying the risk through unconsolidated materials or by a qualitative assessment using bedrock quality designation values obtained from the geotechnical cores; and

        ii. the measures that ANR would implement to minimize these risks.

14. ANR **shall not begin** construction activities **until**:

    a. FERC staff receives final comments from the U.S. Fish and Wildlife Service (FWS) regarding the proposed actions;

    b. FERC staff completes informal or formal Endangered Species Act (ESA) consultation with the FWS, if required; and

    c. ANR has received written notification from the Director of OEP, or the Director's designee, that construction or use of mitigation may begin.

15. **Prior to construction**, ANR shall file with the Secretary documentation of landowner or land-managing agency agreement for any new temporary access roads that would be left in place following construction.

16. **Prior to construction**, ANR shall file with the Secretary documentation of concurrence from the Wisconsin Coastal Management Program that the Project is consistent with the Coastal Zone Management Act.

17. ANR **shall not begin** construction of facilities and/or use of all staging, storage, or temporary work areas and new or to-be-improved access roads **until:**

    a. ANR files with the Secretary:

        i. any remaining cultural resources survey report(s);

      ii.     site evaluation report(s) and avoidance/treatment plan(s), as required; and

      iii.    comments on the cultural resources reports and plans from the Illinois and Wisconsin State Historic Preservation Officers (SHPO) and/or tribes, as applicable.

b.    the Advisory Council on Historic Preservation is afforded an opportunity to comment if historic properties would be adversely affected; and

c.    the FERC staff reviews and the Director of OEP, or the Director's designee, approves the cultural resources reports and plans, and notifies ANR in writing that treatment plans/mitigation measures may be implemented and/or construction may proceed.

All materials filed with the Commission containing location, character, and ownership information about cultural resources must have the cover and any relevant pages therein clearly labeled in bold lettering: **"CUI//PRIV-DO NOT RELEASE."**

18.    **During nighttime construction activities** between 7:00 p.m. and 7:00 a.m. at the HDD site and aboveground facilities, ANR shall monitor noise levels, document the noise levels in the **biweekly** status reports, and restrict the noise attributable to nighttime construction activities to no more than 48.6 decibels on the A-weighted scale (dBA) 24-hour equivalent sound level ($L_{eq}$) at noise sensitive areas.

19.    ANR shall file a noise survey with the Secretary **no later than 60 days** after placing the modified Kewaskum and Weyauwega Compressor Stations in service.  If a full power load condition noise survey is not possible, ANR shall provide an interim survey at maximum possible horsepower load and provide the full load survey **within 6 months**.  If the noise attributable to the operation of the equipment at the compressor stations under interim or full horsepower load conditions exceeds a day-night sound level ($L_{dn}$) of 55 dBA at any nearby noise sensitive areas, ANR shall file a report on what changes are needed and shall install additional noise controls to meet the level **within 1 year** of the in-service date.  ANR shall confirm compliance with the above requirement by filing a second noise survey with the Secretary **no later than 60 days** after it installs the additional noise controls.

20.    ANR shall adopt Route Variation PL-2-B and shall include the route variation in its revised construction alignment sheets filed with its Implementation Plan.  ANR shall include documentation of consultation with the Wisconsin SHPO and FWS regarding cultural and biological resource clearances and surveys regarding this route variation.

21.   ANR shall abandon by removal the Segment PL-3 pipeline in the cultivated area between approximate Mileposts 86.6 and 87.2 and shall include in its Implementation Plan descriptions of the abandonment procedures and construction alignment sheets for the removal.  If ANR reaches an agreement with the landowner to abandon the pipeline in place, ANR shall file documentation with the Secretary **prior to abandonment** indicating the landowner's change in preference for the abandonment method, and then implement the landowner preference at this location.  If ANR believes that there are safety or environmental concerns that have yet to be identified that would preclude the removal, ANR shall file supplemental information and justification with the Secretary and request specific approval from the Director of OEP, or the Director's designee, to abandon the pipeline in place.

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

ANR Pipeline Company                                    Docket No.  CP23-15-000

(Issued December 19, 2023)

CLEMENTS, Commissioner, *dissenting in part*:

1.      I concur with the result of today's Order, but dissent from its discussion regarding the Commission's purported inability to assess the significance of the impacts of greenhouse gas (GHG) emissions.[1]  The majority's insistence that there are no acceptable tools for determining the significance of GHG emissions remains unsupported and gains nothing from nearly constant repetition in recent Commission orders issued under sections 3 and 7 of the Natural Gas Act.

2.      In my concurrence in *Transco,* I explained the history of the language in Paragraphs 93 and 94 of the Order,[2] which is the so-called "*Driftwood* compromise."[3]  In *Driftwood,* the majority suddenly adopted new language declaring that there are no methods for assessing the significance of GHG emissions, and particularly criticizing the Social Cost of GHGs protocol.[4]  I have dissented from this language in *Driftwood* and subsequent orders for two reasons:  (1) it reflects a final Commission decision that it cannot determine the significance of GHG emissions, despite the fact the Commission has never responded to comments in the GHG Policy Statement docket[5] addressing methods for doing so; and (2) the language departs from previous Commission precedent without reasoned explanation, thereby violating the Administrative Procedure Act.[6]  I dissent from Paragraphs 93 and 94 of this Order for the same reasons.

---

[1] *ANR Pipeline Co.,* 185 FERC ¶ 61,191, at PP 93-94 (2023) (Order).

[2] *See Transcon. Gas Pipe Line Co.,* 184 FERC ¶ 61,066 (2023) (Clements, Comm'r, concurring at PP 2-3) (*Transco*).

[3] *See id.* (Phillips, Chairman, and Christie, Comm'r, concurring at PP 1-2).

[4] *See Driftwood Pipeline LLC*, 183 FERC ¶ 61,049, at PP 61, 63 (2023) (*Driftwood*).

[5] Docket No. PL21-3.

[6] *See Driftwood,* 183 FERC ¶ 61,049 (Clements, Comm'r, dissenting at PP 2-3 &

3.      As I have said before, I do not know whether the Social Cost of GHGs protocol or another tool can or should be used to determine significance.  That is because the Commission has not seriously studied the answer to that question.  Rather, the majority simply decided there is no acceptable method, with no explanation of why the Commission departed from the approach taken in earlier certificate orders.[7]  I reiterate that the Commission should decide the important unresolved issues relating to our assessment of GHG emissions through careful deliberation in a generic proceeding with full transparency.

---

n.161); *see also Transcon. Gas Pipe Line Co.*, 185 FERC ¶ 61,133 (2023) (Clements, Comm'r, dissenting in part at PP 2-4); *Transcon. Gas Pipe Line Co.*, 185 FERC ¶ 61,130 (2023) (Clements, Comm'r, dissenting in part at PP 2-3); *Texas LNG Brownsville LLC*, 185 FERC ¶ 61,079 (2023) (Clements, Comm'r, dissenting at PP 9-10); *Rio Grande LNG, LLC*, 185 FERC ¶ 61,080 (2023) (Clements, Comm'r, dissenting at PP 9-10); *Gas Transmission Nw., LLC,* 185 FERC ¶ 61,035 (2023) (Clements, Comm'r, concurring in part and dissenting in part at PP 7-8); *WBI Energy Transmission, Inc.*, 185 FERC ¶ 61,036 (2023) (Clements, Comm'r, dissenting in part at PP 2-3); *Venture Glob. Plaquemines LNG, LLC*, 185 FERC ¶ 61,037 (2023) (Clements, Comm'r, dissenting in part at PP 2-3); *Texas E. Transmission, LP*, 185 FERC ¶ 61,038 (2023) (Clements, Comm'r, dissenting in part at PP 2-3); *Trailblazer Pipeline Co.*, 185 FERC ¶ 61,039 (2023) (Clements, Comm'r, dissenting in part at PP 2-4); *Equitrans, L.P.*, 185 FERC ¶ 61,040 (2023) (Clements, Comm'r, dissenting in part at PP 2-4); *Port Arthur LNG Phase II, LLC*, 184 FERC ¶ 61,184 (2023) (Clements, Comm'r, dissenting in part at PP 2-3); *Venture Glob. Calcasieu Pass*, *LLC*, 184 FERC ¶ 61,185 (2023) (Clements, Comm'r, dissenting in part at PP 2-4); *N. Natural Gas Co.*, 184 FERC ¶ 61,186 (2023) (Clements, Comm'r, dissenting in part at PP 2-3); *Texas E. Transmission, LP*, 184 FERC ¶ 61,187 (2023) (Clements, Comm'r, dissenting in part at PP 2-4); *Equitrans, L.P.*, 183 FERC ¶ 61,200 (2023) (Clements, Comm'r dissenting at PP 2-3); *Commonwealth LNG, LLC*, 183 FERC ¶ 61,173 (2023) (Clements, Comm'r, dissenting at PP 5-8); *Rio Grande LNG, LLC*, 183 FERC ¶ 61,046 (2023) (Clements, Comm'r, dissenting at PP 14-15); *Texas LNG Brownsville LLC*, 183 FERC ¶ 61,047 (2023) (Clements, Comm'r, dissenting at PP 14-15).

[7] Before its decision in *Driftwood,* the Commission had explained that it was not determining the significance of GHG emissions because the issue of how to do so was under consideration in the GHG Policy Statement docket.  *See, e.g., Transcon. Gas Pipe Line Co.*, 182 FERC ¶ 61,006, at P 73 & n.174 (2023); *Columbia Gas Transmission, LLC*, 182 FERC ¶ 61,171, at P 46 & n.93 (2023).  To depart from prior precedent without explanation violates the Administrative Procedure Act*. See, e.g., W. Deptford Energy, LLC v. FERC*, 766 F.3d 10, 17 (D.C. Cir. 2014) ("[T]he Commission cannot depart from [prior] rulings without providing a reasoned analysis. . . .") (citations omitted).

Document Accession #: 20231219-3072     Filed Date: 12/19/2023

For these reasons, I respectfully dissent in part.


_____
Allison Clements
Commissioner

Document Content(s)

CP23-15-000.docx.......................................................1